**Bonnie BRECKER, Eugene Kamish and Joel Hochberg, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**QUEENS B'NAI B'RITH HOUSING DEVELOPMENT FUND CO., INC.; Samuel R. Pierce, Jr., as Secretary of the United States Department of Housing and Urban Development, Defendants.**

**No. 83 CV 4751.**

United States District Court, E.D. New York.

April 10, 1985.

New York Lawyers for the Public Interest, Inc. by Herbert Semmel, Lewis Golinker, New York City, for plaintiffs.

Olnick, Boxer, Blumberg, Lane & Troy by Donald A. Derfner, John H. Beers, New York City, for defendant Queens B'nai B'rith Housing Development Fund Co. Inc.

Raymond J. Dearie, U.S. Atty., E.D. N.Y., by Charles S. Kleinberg, Asst. U.S. Atty., Brooklyn, N.Y. (Howard M. Schmeltzer, Anthony J. Ciccone, Jr., U.S. Dept. of Housing and Urban Development, Washington, D.C., on brief), for defendant HUD.

## MEMORANDUM AND ORDER

PLATT, District Judge.

The disposition of this suit turns largely on how to interpret Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (hereinafter referred to as "Section 202" or "the Act"). In this Court's view, the primary issue raised by plaintiffs' suit is whether a recipient of federal funds, awarded pursuant to Section 202, is required by law or the Constitution to use those funds to benefit all four classes affected by Section 202 or whether such funds may be earmarked to benefit only one of the four classes of persons covered by Section 202 whose needs, as defined in the statute, are materially different from those of the other classes covered by Section 202.

Plaintiffs, Eugene Kamish and Joel Hochberg,[1] claim to fall within the class of individuals covered by Section 202 as the "developmentally disabled." Despite their conceded handicaps, plaintiffs allege that they are capable of living independently and need no special services to be provided by the particular housing facility in which they live. They further allege that any services which they might need can be obtained in the community surrounding the Queens B'nai B'rith (hereinafter referred to as "QBB") Section 202 funded housing project into which they have been denied admission.

By reason of their particular attributes, described above, plaintiffs assert that they have a right to be considered for places in the Section 202 project sponsored by QBB. Because plaintiffs were denied places in QBB's facility with HUD's approval, plaintiffs argue that their exclusion violates the anti-discrimination provisions, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the Section 202 Housing Act itself, the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.*, and the Due Process and Equal Protection Clauses of the Constitution.

The federal defendant, Samuel R. Pierce, Secretary of the U.S. Department of Housing and Urban Development (hereinafter referred to as "HUD"), and defendant QBB argue that HUD funded QBB's project to serve only the well elderly and the mobility impaired.[2] The federal defendant HUD asserts that the terms of QBB's funding do not permit QBB to accept as residents members from the other two classes covered by Section 202, the developmentally disabled and the chronically mentally ill. Moreover, both defendants note that QBB was selected as a sponsor of a housing project for the well elderly specifically because of QBB's experience in working with this group; that is, persons who are 62 years of age and older who do not require special in-house services. Both defendants also note that QBB has no experience working with the developmentally disabled nor does the project offer any special services for this group.

The only specific service offered by QBB at its own expense is a full-time "social coordinator" who is supposed to facilitate the well elderly residents' ability to rely on each other for support in their day-to-day lives in the building. Because the building has 190 units, QBB's asserted philosophy is that there should be enough well elderly within the building to permit them to form both their own interdependent community within the building and smaller social groups. Plaintiffs argue that the provision of one social coordinator does not constitute a special service; plaintiffs otherwise ignore QBB's asserted philosophy concerning the creation of an independent, interdependent community for the elderly.

Procedurally, this action is now before the Court on a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by the federal defendant as joined by defendant QBB. Plaintiffs have cross-moved for summary judgment. For the reasons stated herein, the Court rules that based on the undisputed facts in this case, summary judgment lies in favor of the defendants as a matter of law. As a

---

1. The third named plaintiff, Bonnie Brecker, has withdrawn from this action.

2. According to HUD's minimum property standards for new multi-family housing, a recipient of HUD funds was required to insure that 10% of the new facility's units would be designed so that they were accessible to the mobility impaired or physically handicapped. *See* Def. HUD's Ex. E. Although the elderly are likely to develop physical handicaps, these HUD standards do not permit QBB, for example, to restrict applicants for these accessible units to just the elderly. Rather, under these standards,

HUD requires that the project sponsor accept mobility impaired applicants whether or not they are also elderly (*i.e.*, 62 or over). This requirement does not derive from Section 202 even though the mobility impaired, who are one of the four groups covered by Section 202, happen to benefit from this requirement. As a consequence of these HUD standards, QBB was required to make 10% of its 190 units, or 19 units, accessible to the mobility impaired and to accept applicants for these accessible units who may not have been elderly, so long as they were mobility impaired.

result of this decision, the Court does not address plaintiffs' motion for class certification.

### Statutory Scheme of Section 202

The purpose of Section 202 as stated in the statute is to assist private nonprofit corporations or public agencies "to provide housing and related facilities for elderly or handicapped families." 12 U.S.C. § 1701q(a)(1).

Under the Act, HUD is authorized to make long-term, low-interest rate loans, 12 U.S.C. § 1701q(a)(3), to any sponsor or developer which has shown that it is otherwise "unable to secure the necessary funds from other sources upon terms and conditions equally as favorable" as the loans available under Section 202. 12 U.S.C. § 1701q(a)(2)(A). A sponsor or developer may also apply to HUD to receive on behalf of its low income tenants, rent subsidy money for a number of units in the project pursuant to Section 8 of the U.S. Housing Act of 1937. 12 U.S.C. § 1701q(g).[3] The facts that a sponsor may receive a loan not otherwise available in the free market and rent subsidies so that the rent received is comparable with that which could be charged in the free market are not, however, the key features of Section 202 of relevance in this action.

These key features are twofold: one relates to the definition of the four classes of individuals and their families eligible for Section 202 funded housing; the other relates to the fact that Section 202 funds are limited to the development cost of a project and do not cover the ongoing costs of providing the special services that are needed by certain Section 202 eligible groups. A Section 202 project sponsor must pay for these services or seek reimbursement from other government programs.

### (a) Eligible Groups

Section 202, 12 U.S.C. § 1701q(d)(4), states that a person who is elderly, defined

simply as being someone who is 62 years of age or older, is eligible to participate in a Section 202 program.

It also states that a person who is handicapped is eligible; such a person

> shall be considered handicapped if such person is determined, pursuant to regulations issued by the Secretary, to have an impairment which (A) is expected to be of long-continued and indefinite duration, (B) *substantially impedes his ability to live independently, and* (C) *is of such a nature that such ability could be improved by more suitable housing conditions.*

12 U.S.C. § 1701q(d)(4) (emphasis added).

Beyond the above definition for a handicapped person, Section 202 provides nothing further. More specific definitions for two of the three groups of handicapped persons eligible for Section 202 housing, the mobility impaired and the chronically mentally ill, are found elsewhere. However, as more detailed definitions for these two groups are not of importance to this action, we will go on to the third group of handicapped persons, the developmentally disabled—which plaintiffs allege themselves to be and which is the fourth and last group eligible for Section 202 housing.

Section 202, 12 U.S.C. § 1701q(d)(4), further states that a "person shall also be considered handicapped if such person is a developmentally disabled individual as defined in § 102(5) of the Developmental Disabilities Services and Facilities Construction Act of 1950." *Id.* The definition of a developmentally disabled individual, as codified at 42 U.S.C. § 6001, provides that:

> (7) The term *"developmental disability."* means a *severe, chronic disability of a person which* —
>
> > (A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

3. According to defendant HUD's brief, the rent subsidy which is paid directly to the landlord under Section 8 of the 1937 Housing Act constitutes the difference between the fair market rent of the unit and the amount of rent that the low income tenant is deemed capable of paying. Def. HUD's Memorandum of Law at pp. 7–8.

(B) is manifested before the person attains age twenty-two;

(C) is likely to continue indefinitely;

(D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self-care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self-direction, (vi) capacity for independent living, and (vii) economic self-sufficiency; *and*

(E) *reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.*

(Emphasis added.) The term facility for a developmentally disabled person is also codified at 42 U.S.C. § 6001; such a facility is defined as

*a facility* or a specified portion of a facility, *designed primarily for the delivery of one or more services* to persons with one or more developmental disabilities.

42 U.S.C. § 6001(2) (emphasis added).

(b) *Costs of Special Services*

Section 202 loans may not exceed the total development cost of the project, 12 U.S.C. § 1701q(a)(3), which is defined as the "costs of construction of housing and other related facilities, the cost of movables necessary to the basic operation of the project ... and of the land on which it is located, including necessary site improvement." *Id.* at § 1701q(d)(3).

This definition goes on to provide that in the case of housing for the handicapped or primarily nonelderly persons, the development cost may also include "the cost of acquiring existing housing and related facilities, the cost of rehabilitation, alteration, [and] conversion." *Id.*

"Related facilities" are generally described as structures needed for providing "essential services," such as "cafeterias or dining halls, community rooms or buildings, workshops, adult day health facilities,

or other outpatient health facilities." 12 U.S.C. § 1701q(d)(8).

Over and above the "development cost" of a Section 202 project, a sponsor must carry the expense of providing the operational or day-to-day costs of special services needed by certain Section 202 eligible groups, primarily the handicapped, to the extent that these costs are not reimbursed by private or government programs, such as medical and disability insurance, and the rent subsidies, previously noted above. 12 U.S.C. § 1701q(m) further reinforces the point that a project sponsor may not be prohibited by HUD from exercising its discretion to provide voluntarily "funds from other sources for amenities and other features ... suitable for inclusion in such project if the cost of such amenities is (1) not financed with the loan, and (2) not taken into account in determining the amount of Federal subsidy or of rent contribution of tenants."

(c) *Selection of Sponsors*

Though not essential to the outcome of this case a few points regarding the selection of sponsors for Section 202 loans is worth mentioning here in order to round out an understanding of how this program works, as well as to address certain arguments made by plaintiffs. The following information concerning selection of program sponsors is taken from the Declaration of Robert W. Wilden, Director of the Assisted elderly and Handicapped Housing Division, U.S. Dep't of HUD, Central office; the HUD § 202 Handbook which is appended as Exhibit A to his Declaration, and Mr. Wilden's deposition which is appended as Exhibit A to Assistant U.S. Attorney Charles S. Kleinberg's Declaration.

The first point to note is that applications to HUD by sponsors offering to serve different Section 202 groups compete against each other for the funds available. In selecting applications for funding, HUD takes into account the need for housing for the group sought to be served in the area of the proposed project and whether that area has been underfunded in the past for housing of that type relative to need and to funding extended in other areas. Thus,

through HUD's funding decisions, it is in a position to allocate Section 202 loans in a particular region according to the need in that locality for housing for each Section 202 group. HUD is supposed to try to the extent possible to approve an appropriate mix of units for the elderly and the handicapped.

The second point to note is that a sponsor applies for and is approved by HUD to serve a particular group of the groups eligible for Section 202 funds. A sponsor may not unilaterally decide it wishes to serve a different group from the one it was approved to serve. Moreover, if a sponsor wishes to serve another group in addition to the one it was approved to serve, it must apply for approval to do so.

The final point to note is that HUD will not approve an application unless the sponsor affirmatively demonstrates that it possesses the resources and experience to meet the special needs of the group it is applying to serve. The sponsor should demonstrate that it has a specific plan for the delivery of services appropriate for the particular group, that the proposed facilities and staffing are adequate and that the overall size of the project is appropriate for the particular group.

Concerning size, Congress has specifically amended Section 202 so as to encourage the development of "small and scattered site group homes and independent living facilities for nonelderly handicapped persons and families." 12 U.S.C. § 1701q(k)(2). As stated by the federal defendant,

> the entire thrust of the § 202 housing program for the handicapped is to help integrate such persons into the community by providing small, more home-like projects in residential areas, rather than an institutional type environment (which a developmentally disabled high-rise would be perceived as, with justification).

Def. HUD Memorandum of Law at 17.

## ANALYSIS

A. *Section 202*

Plaintiffs argue that the Court should focus on 42 U.S.C. § 6001(7)(D), which

states that a developmentally disabled person can have "substantial functional limitations in three or more" of seven enumerated areas of major life activity and still retain a capacity for independent living, which is listed as the sixth of the seven specified areas.

Inexplicably, plaintiffs ignore the next subsection, 42 U.S.C. § 6001(7)(E), which is predicated by the conjunctive word "and", stating that a person who is developmentally disabled reflects the need "for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated." Thus even if we were to assume that plaintiffs have a capacity for independent living, according to the full statutory definition, they are still in need of a substantial range of services. Plaintiffs assert that any services they might need can be obtained in the community surrounding the QBB facility. Even assuming this to be true, the language quoted above indicates that someone in the Section 202 project must be responsible for planning and coordinating the services needed by the plaintiffs; plaintiffs do not address this point.

QBB certainly may not be expected to fulfill the role of service coordinator. The statutory design and selection process for Section 202 sponsors permits HUD to select only persons with experience serving the particular group they have offered to sponsor. QBB has no experience serving the developmentally disabled.

More importantly, 42 U.S.C. § 6001(2) states that a facility for the developmentally disabled should be "designed primarily for the delivery of one or more services" to such persons. In the present case, QBB may not possibly be considered a facility for the developmentally disabled because it provides no services for such persons.

Furthermore, if plaintiffs claim to need no services from the housing project they live in, then *a fortiori*, they fall outside of

the class of the developmentally disabled who by definition of statute must live in a facility that provides special services.

As argued by defendant, and this Court agrees, Section 202 was not meant to provide subsidized housing for those simply in need of it. Section 202 is more than a rent and roof subsidy or merely "housing simpliciter." Rather, it is a housing *and* services program. The services being offered need only be commensurate with the needs of the Section 202 population being served. Thus, QBB in serving the well elderly who need minimal services, provides only a minimal service—a social coordinator, who works to implement QBB's aim of generating a self-sufficient, interdependent community of the elderly within the building.

The Court notes that plaintiffs also do not fall within the general definition of a handicapped person found in 12 U.S.C. § 1701q(d)(4), which states that the person's handicap must be of such a nature that it "substantially impedes his ability to live independently" and "is of such a nature that such ability could be improved by more suitable housing conditions."

As mentioned before, plaintiffs argue that they need no special services to be provided by the facility they live in, being capable of obtaining them in the community outside the facility. But if this is the case, then plaintiffs' ability to live more independently has in no way been improved by more suitable housing conditions. The only argument that plaintiffs make in this vein is that their lives would be improved if one plaintiff did not have to live in a ghetto and the other plaintiff with his parents, because neither of them can afford anything else. Without doubt the plaintiffs' lives might improve if they had their own places or safer apartments. But plaintiffs have not shown how their particular alleged disabilities would be improved by living in QBB's facility as opposed to simply a low income, rent subsidized apartment.

Notably, the fact that there might be no readily available low income projects in plaintiffs' neighborhood other than QBB does not justify requiring QBB to accept them. As discussed, HUD's asserted practice in selecting sponsors takes into account shortages of housing for certain Section 202 groups and previous practices of underfunding for these groups. Given this method, presumably HUD awarded QBB funds to build its project in the Flushing, Queens, New York area because there was a particular shortage of housing for the elderly as opposed to the other Section 202 groups and/or because this region had received relatively less funding for the elderly in relation to other Section 202 groups.

Even if QBB wanted to serve the developmentally disabled, assuming *arguendo* that plaintiffs fall within this group, QBB could not unilaterally decide to admit plaintiffs. QBB would have to apply to HUD to serve this group and be approved to do so. QBB's application would have to show it had the capacity and skill to provide any special services a developmentally disabled person might need. As QBB has had no experience with the developmentally disabled, HUD would be unlikely to approve its application. Moreover, because of the size of QBB's facility, 190 units, HUD would be reluctant to accept QBB as a sponsor even if it had experience in dealing with developmentally disabled, because Section 202, 12 U.S.C. § 1701q(k)(2), and HUD's regulations direct HUD to choose small-scale, home-like programs and scattered sites for the handicapped over large-scale concentrated institutional type programs.

Again assuming plaintiffs fall within the class of the developmentally disabled, it should be noted that if HUD were to require QBB to serve a group it had not volunteered to serve, it would in effect thwart QBB's charitable purpose. It would also be unclear who should pay the costs of services required by the developmentally disabled if they were to live at QBB and full reimbursement from other sources (*i.e.*, other than Section 202) was not available. In this Court's view, it would seem quite unfair to make QBB pick up these

costs when it had not volunteered to serve the developmentally disabled.

▮ In sum, the Court finds that plaintiffs, by their own self-descriptions as being mildly retarded but capable of living independently and in need of no special services to be provided by a housing facility, place themselves outside of the four classes of persons eligible for Section 202 housing; such eligible persons having been defined in Section 202, 12 U.S.C. § 1701q(d)(4) and in 42 U.S.C. § 6001(7).

▮ As should be evident from our analysis, the definition of a facility for the developmentally disabled as one that provides one or more services, 42 U.S.C. § 6001(2), functions now *to exclude* from eligibility for Section 202 housing the mildly retarded who *need no* special services to be provided by a housing facility.

The Court has no doubt that the class plaintiffs purportedly represent, the mildly retarded, may indeed be in need of subsidized housing because their limited mental abilities tend to restrict their own income-earning potential. But despite this need, it is not proper for this Court judicially to rewrite Section 202 and 42 U.S.C. § 6001(7)

in order to fulfill the need of this purported class for subsidized housing. Plaintiffs would be better advised to obtain the remedy they seek from Congressional clarification of the statute's definitions of the developmentally disabled and facilities for them.

## B. *Section 504*

Plaintiffs argue that HUD has sanctioned discrimination through its administrative approval of QBB's Management Plan, which excludes all non-mobility impaired handicapped persons as eligible tenants. By doing so, plaintiffs allege that the defendants have violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (hereinafter referred to as Section 504).

Section 504 declares that: "No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." [4]

**4.** It is interesting to note that the definition of a handicapped individual as provided by Section 504 differs from the definition of a handicapped person as found in Section 202, 12 U.S.C. § 1701q(d)(4) and a developmentally disabled person as cross-referenced in Section 202 and found at 42 U.S.C. § 6001(7); these later two sections were quoted previously in the text above. Section 504's definition as found at 29 U.S.C. § 706(7) provides that:

(A) Except as otherwise provided in subparagraph (B), the term "handicapped individual" means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services provided pursuant to subchapters I and III of this chapter.

(B) Subject to the second sentence of this subparagraph, the term "handicapped individual" means, for purposes of subchapters IV and V of this chapter, any person who (i) has a physical or mental impairment which substantially limits one or ore of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having

such an impairment. For purposes of sections 793 and 794 of this title as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others.

Defendant QBB argues that plaintiffs cannot be capable of independent living and fall within the definition of a handicapped person as defined in Section 504, which states that such a person "has a physical or mental impairment which substantially limits one or more of such persons' major life activities." 29 U.S.C. § 706(7)(B)(i). The regulation defining the term "major life activities" as just quoted, states that they are "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(ii).

The federal defendant maintains simply that a person may not be developmentally disabled and fall within the definition of 42 U.S.C. § 6001(7), but does not address the question of

■ By its plain language, Section 504 prohibits discrimination against handicapped persons who are "otherwise qualified" for a federally assisted program. In the present case, plaintiffs may properly be denied admittance to QBB's facility because they are neither elderly nor mobility impaired. This denial does not rest on the improper grounds of discrimination because of their handicap, but rather on the basis of their lack of either of the two necessary qualifications of age (i.e., 62 or over) or mobility impairment.[5]

■ This basic point aside, plaintiffs would instead have this Court accept their argument that Section 504 requires that they be admitted into QBB, sponsored as it was for the elderly and mobility impaired, merely because plaintiffs are as (allegedly) developmentally disabled adults, also a group covered by Section 202.[6]

In the first place, this argument ignores the express language of Section 202 which permits sponsorship of only one of the four groups covered.

But, second and perhaps more importantly, for the Court to accept this argument would be to hold that when Congress passed Section 504, a general civil rights statute, it meant to revoke or repeal Section 202, a much more specific statute with an articulated program. Acceptance of this view would be contrary to the well-settled rule of statutory construction that a general statute will not be construed so as to repeal or revoke another more particular statute, regardless of the priority of enactment, absent express language by Congress stating its intent to revoke or repeal that statute. *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

Thirdly, accepting plaintiffs' argument would lead to the requirement that Section 202 housing sponsors accept members from all classes covered by the statute regardless of which class or classes the sponsors had originally intended to serve. This result would be clearly contrary to case law holding that Section 504 may not be used to expand the delivery of benefits awarded under another statute if that statute otherwise restricts the delivery of benefits. *See, e.g., Doe v. Colautti*, 592 F.2d 704, 708–10 (3d Cir.1979) (Section 504 does not require a state to extend the same medical benefits to the mentally ill as to the physically ill; while it forbids the automatic exclusion of a physically ill person who also has a mental ailment from a treatment program for the physically ill only because of the patient's mental problems, it does not require the expansion of the program to treat the mental problem as well.); *Bernard B. v. Blue Cross and Blue Shield of Greater*

---

whether plaintiffs may properly be considered handicapped within the meaning of Section 504.

While these inconsistencies in the definition of a handicapped individual might be of some consequence in another case, the Court finds that in this case these inconsistencies are of no real consequence because the Court has found: (1) that whether plaintiffs fall within the definition of the developmentally disabled and are simultaneously capable of independent living does not matter because plaintiffs are not eligible for QBB's Section 202 project by reason of being neither elderly nor mobility impaired; and (2) that whether plaintiffs fall within the meaning of Section 504 and are simultaneously capable of living independently is also of no consequence because by assuming that plaintiffs do fall within the Act, the Court finds above that it is not violated.

5. Looking by comparison at another civil rights statute, the Age Discrimination Act of 1975, 42 U.S.C. § 6103, which is similar to Section 504, we find an analogous result. For example, if otherwise normal elderly persons (i.e., 62 or over) were to be denied admission to a Section 202 housing facility for the developmentally disabled, they could not successfully argue that they were being discriminated against on the basis of age. These elderly persons would simply be not otherwise qualified. For the sake of completing this comparison, it is worth noting how closely the language of the ADA tracks the wording of Section 504. The ADA declares "no person in the United States, shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving federal financial assistance."

6. Extending plaintiffs' argument further, it would appear that they would label QBB's sponsorship of a housing facility for the elderly "discriminatory." Federal funding for housing for just the elderly has long been upheld as not discriminatory. *See, e.g., Acevedo v. Nassau County, N.Y.*, 500 F.2d 1078 (2d Cir.1974).

*New York,* 528 F.Supp. 125, 129–33 (S.D.N. Y.1981), *aff'd on opinion below,* 679 F.2d 7 (2d Cir.1982) (Section 504 may not require that all medical conditions be covered by medical insurance simply because some medical conditions are; exclusions of some conditions from coverage is not discrimination based upon handicap.); *Duquette v. Dupuis,* 582 F.Supp. 1365, 1369–73 (D.N.H. 1984) (Section 504 does not require that a program providing medical assistance only to persons under the age of eighteen years of age who were blind extend its benefits to persons over the age of eighteen who suffer from other handicaps.).[7]

Finally, and perhaps most importantly, plaintiffs' argument that Section 202 violates Section 504 by allowing a sponsor to accept only the elderly or mobility impaired ignores the fact that Section 504 is simply a declaration of the civil rights of the handicapped. It is not an affirmative action program. *Southeastern Community College v. Davis,* 442 U.S. 397, 410–11, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) ("Section 504 does not refer at all to affirmative action and ... it does not provide for implementation by administrative action."). Moreover, although the Supreme Court in the *Davis* case recognized that "the line between a lawful refusal to extend affirmative action and illegal discrimination" will not always be clear, 442 U.S. at 412, 99 S.Ct. at 2370, Section 504 does not require a program sponsor to modify the essential purpose of its program or undergo undue financial burdens to accommodate all handicapped persons. *See also Strathie v.*

*Dep't of Transportation,* 716 F.2d 227 (3d Cir.1983).

The *Davis* case upheld the defendant nursing college's denial of admission to a deaf applicant because even though she might benefit from the program and be able to perform certain nursing jobs upon graduation, "the purpose of [the college's] program was to train persons who could serve the nursing profession in *all* customary ways." 442 U.S. at 412, 99 S.Ct. at 2370 (emphasis added). Since that purpose was inconsistent with the applicant's admission, the Court held that Section 504 did not require her acceptance.

Following the *Davis* case, a case here in the Second Circuit elaborated on the test for deciding whether a Section 504 violation occurred by stating that "[t]he pivotal issue is not whether the handicap was considered but whether under all the circumstances it provides a reasonable basis for finding the plaintiff not to be qualified or not as well qualified as other applicants." *Doe v. New York University,* 666 F.2d 761, 776 (2d Cir.1981). In *Doe,* the Second Circuit recognized that N.Y.U. might have a reasonable basis for considering plaintiff's recurrent psychological problems to be a reason for not admitting her on the basis that her handicap would make her a less qualified candidate for admission to medical school; this was held, however, to be a question of fact. *Id.*

■ Applying the above to the present case, we find that even if we assume ar-

---

**7.** The language used by the Court in the *Duquette v. Dubois* opinion to dispose of plaintiffs' argument for a more expansive interpretation of Section 504 is worth quoting here as further illustration that Section 504 may not be used to expand or rewrite Section 202. In *Duquette,* the Court stated that:

> In essence, plaintiff attempts to transform the § 504 shield against invidious discrimination into a sword to secure expanded state aid programs and equal medical assistance benefits for all classes of handicapped persons. ... § 504 does not override the express Medicaid program eligibility requirements and funding conditions found at 42 U.S.C. § 1396a. [Citation omitted.] Furthermore, § 504 does not require states to undertake

> "affirmative action" such as expanded medical assistance programs to overcome the disabilities of handicapped persons....
>
> ....
>
> ... [T]he fact that Congress did not include explicit conditions concerning distribution of Medicaid funds among all classes of handicapped persons in the relevant Medicaid funding provisions, 42 U.S.C. § 1396a, indicates that Congress never intended that § 504 be construed to impose fund distribution conditions on state recipients in addition to the explicit conditions of 42 U.S.C. § 1396a. [Or, by analogy, fund distribution and access conditions on recipients of benefits under Section 202, 12 U.S.C. § 1701q.]
> 582 F.Supp. at 1369–70.

*guendo* that QBB denied plaintiffs' applications on the basis of their handicaps, Section 504 would still not necessarily have been violated. Relying on the *Davis* case, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980, QBB could well argue that its purpose was to provide housing with minimal services for the elderly and mobility impaired and that acceptance of plaintiffs would be inconsistent with this purpose because facilities for the developmentally disabled by definition must provide one or more services specifically for them, 42 U.S.C. § 6001(2). Similarly, QBB could rely on the *Doe v. New York University* case, 666 F.2d 761, to argue that it had a "reasonable basis" for finding that plaintiffs were not as qualified as the other applicants who were elderly and/or mobility impaired.

Notably, the only hypothetical fact pattern that would raise this question of fact as to whether QBB had a "reasonable basis" for denying an applicant would be a case in which an applicant to QBB were to be both elderly (*i.e.*, 62 or over) *or* mobility impaired *and* developmentally disabled. In this instance, HUD has stated on the record that QBB would have to admit developmentally disabled elderly persons if their admission could be accomplished without .imposing undue financial burdens or modifying the essential purpose of the program.[8] Significantly, using this analysis, QBB could still reject such a hypothetical applicant without violating Section 504.

Before finishing this discussion of Section 504, we note that in a recent case, *Edge v. Pierce*, Civil No. 82–51, (D.N.J. May 22, 1984) (Decision at 16–23), a district court was faced with the type of fact pattern we mentioned hypothetically. In *Edge*, the defendants had denied plaintiffs' admittance on the basis of their handicap, mental illness.

Thus, the Court found that there was possibly a Section 504 violation because the denial of plaintiffs' admittance on the basis of their handicap raised a question of fact as to whether defendants had a reasonable basis for doing so and whether plaintiffs could be admitted without undue burden to defendants or changing the essential nature of the program. Since in the present case, we are not confronted by a sponsor who denied applicants on the basis of their handicaps, but rather because they lacked the necessary qualifications of being either elderly or mobility impaired (or both), the *Edge* ruling, though inapposite here, is compatible with our ruling today.

## C. The Developmentally Disabled Assistance and Bill of Rights Act

■ Plaintiffs also argue that HUD's approval of QBB's present admission policies violate the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.* This Act states that express federal policy is against the separation of the developmentally disabled. However, this Act, like Section 504 discussed above, is simply a general declaration of the civil rights of the developmentally disabled. Like Section 504, it may not be said that Congress intended by its passage to expand or modify the Section 202 Housing Act of 1959. Following the reasons and analysis which this Court used to find that Section 504 was not violated in this case, the Court also finds that this Bill of Rights is not violated in the instant case.

## D. Equal Protection

Plaintiffs argue that this Court should apply a hybrid standard of review under

---

**8.** In its Reply Memorandum of Law in Support of its Motion for Summary Judgment, HUD asserts at pages 72–73 that:

> [T]he essential eligibility requirement for a non-accessible unit at the B'nai B'rith project is having reached the age of 62. If a qualified DD [developmentally disabled] person, *e.g.*, one who is elderly and is capable of living at the project, applies, *then he would have to be admitted.*

(Emphasis added.) By "capable of living at the project", the Court was given to understand that this meant accommodated without an undue burden or change in the essential nature of the program, which is, of course, a question of fact. While potentially a sponsor might abuse its discretion in this area, such a case is not now before us.

which the mentally retarded would be deemed a "quasi-suspect" class and under which the Court would inquire whether the Section 202 program is rationally related to a substantial Government interest.

To survive intermediate scrutiny, the Court need only find that the Section 202 program "reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial [governmental] interest." *Plyler v. Doe,* 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

■ Without becoming embroiled in an analysis of whether this intermediate level of scrutiny should even apply, the Court finds that the Section 202 program is clearly a reasonable means of furthering the substantial interest the Government has in affording elderly and handicapped persons with housing which is tailored to their distinct and varied needs. Therefore, since it is possible to find the Section 202 program constitutional at this intermediate level, it is most certainly constitutional at a lower level of scrutiny, the so-called rational basis test wherein a program need only be reasonably related to a legitimate Government interest.

## E. *Addendum*

Before closing the Court must address a problem created by a misunderstanding between the National and Regional HUD Offices concerning the proper method of managing Section 202 housing projects. As a result of this misunderstanding, QBB accepted two nonelderly, non-mobility impaired persons into its project. This in turn strengthened plaintiffs' belief that as nonelderly, non-mobility impaired persons, they had an equal right as the two persons who were accepted, also to be accepted as tenants at QBB's project.

After QBB was approved as a sponsor for the well elderly who need only minimal services, the New York HUD Regional Office insisted that QBB consider applications by handicapped persons other than the mobility impaired for whom 10% of the units

were set aside; specifically, this meant accepting applications from the developmentally and the chronically mentally ill. QBB rejected the applications of these latter two groups that it received, primarily because QBB believed that the applicants were not capable of living on their own.

Subsequently, the Regional Office further insisted that QBB interview these applicants who they had initially turned away to permit them to submit proof of their ability to live independently and to have QBB's personnel make a fairer assessment by granting the applicants interviews.

From these interviews, QBB accepted two nonelderly, non-mobility impaired adults who needed no special services to be provided by the QBB facility, but who were still eligible for Social Security disability benefits. These two individuals are now living in the QBB project.

The plaintiffs are among the applicants who QBB initially rejected and who QBB again rejected after granting them interviews and an opportunity to submit proof of their ability to live independently. In the view of the QBB personnel who conducted the interviews, plaintiffs were not able to demonstrate that they were capable of living independently and without need of special services or supervision.

Plaintiffs now argue that they were not given an adequate opportunity to provide proof of their ability to live independently. Moreover, plaintiffs' attorneys submitted an expert's opinion based on the expert's examination of plaintiffs, attesting to plaintiffs' capacities for independent living as long as services and support were available in the surrounding community. Affidavit of Dr. Rosamond Rae in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiffs' Motion for Summary Judgment.

This "proof" from plaintiffs' expert, as well as the fact that two nonelderly, non-mobility impaired individuals now live in the QBB project, is pointed to by plaintiffs' attorneys as an indication that QBB could admit more persons like plaintiffs who are neither elderly nor mobility impaired and

who are allegedly capable of living independently.

The National HUD Office, upon realizing that their Regional Office had a somewhat different understanding of the Section 202 Housing Act, addressed a series of memoranda to the Regional Office, attempting to clarify the appropriate method of implementing the Section 202 Housing Act.

Plaintiffs may not now use a misunderstanding by a Regional HUD Office to bootstrap themselves into having the right to live in a Section 202 subsidized housing project sponsored for the well elderly. Thus, this Court perforce must treat this factual aberration (*i.e.*, that QBB now has two nonelderly, non-mobility impaired tenants) as just that, an incorrect implementation of the statutory scheme intended by Congress; it is a mistake which may not open the door to housing rights for plaintiffs.

In sum, the Court holds that *neither* the fact that two nonelderly, non-mobility impaired individuals now live in QBB, *nor* the fact that plaintiffs' ability to live independently is a contested question of fact, is of any legal significance now.

For the reasons stated above, the Court grants summary judgment to the defendants and plaintiffs' complaint is hereby dismissed.

SO ORDERED.