**Marie ALMONTE, Bonifacio Baez, Saturina Santana, Juan Tavares, Ricard Santiago, Magdalena Cruz, Ana Espinal, Augustina Muniz, Marie Gonzalez, Ramona Santiago, Ana Polanco, Ana Cruz, Abebi Adeyeye, and Alphonso Brown, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Samuel R. PIERCE, Jr., individually and as Secretary of the United States Department of Housing & Urban Development (HUD); HUD; Goodheart Housing Development Fund Co., Inc. (Goodheart HDFC); Congregation Yetev Lev D'Satmar (the Congregation); and, Berl Friedman, individually and as agent for Goodheart HDFC and the Congregation, Defendants.**

No. 87 Civ. 3358–CSH.

United States District Court,
S.D. New York.

July 28, 1987.

Puerto Rican Legal Defense & Educ. Fund, Inc., New York City, Linda Flores, Richard Rivera, Philip L. Boneta, of counsel, and Brooklyn Legal Services, Corp. A, Brooklyn, N.Y., Co-Counsel, for plaintiffs; Martin S. Needelman, Pat Murray, Wayne Saitta, Edwin Vega, of counsel.

Rudolph W. Giuliani, U.S. Atty. for the S.D.N.Y., New York City, for defendants Samuel R. Pierce, Jr., individually and as Secretary of the U.S. Dept. of Housing and Urban Development and the U.S. Dept. of Housing and Urban Development; Nancy G. Milburn, Asst. U.S. Atty., of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for defendants Goodheart Housing Development Fund Co., Inc., Congregation Yetev Lev D'Satmar, Inc., and Berl Friedman; Theodore B. Van Itallie, Jr., Frederick B. Campbell, Robert D. Wilson, Jr., of counsel.

HAIGHT, District Judge:

In this case I am asked to enjoin preliminarily the renting and occupation of a federally funded housing project in Brooklyn intended for the elderly or handicapped.

The named plaintiffs allege that they did not apply to the project because they were unlawfully not advised of it, or, being so advised, applied and were unlawfully declared ineligible. They seek to represent a class consisting of "low-income Puerto Rican, other Hispanic, and Black elderly and physically handicapped individuals who have been or will be denied equal access" to the building "because of defendants' pattern and practice of utilizing race, relition [sic], national origin and handicap as a qualification for rental.[1]

Plaintiffs charge the sponsor, owner and agent of the project (the "private defendants") with engaging in that discrimination in violation of the Constitution and applicable statutes and regulations. They charge the federal Department of Housing and Urban Development ("HUD") and its Secretary (the "federal defendants") with failing to detect or correct the private defendants' illegal acts.

The preliminary injunction prayed for would enjoin the private defendants from renting apartments in the now-completed building, require them to discard the present applicant pool, and require remarketing of the project ab initio. The federal defendants would be enjoined, in essence, to enforce their constitutional, statutory, and regulatory responsibilities in respect of the project, as plaintiffs conceive them to be.

I.

Defendant Congregation Yetev Lev D'Satmar, Inc. (the "Congregation") is composed of twelve synagogues of the Satmar Hasidic sect of Orthodox Judaism. In March 1984 the Congregation proposed to HUD a federally funded 59–unit apartment house to be built at 166 South 9th Street in the Williamsburg section of Brooklyn. The proposed building bore the name "Goodheart House." The Congregation set up defendant Goodheart Housing Development Fund Co., Inc. ("GHDF"), a New York corporation, to own and operate Goodheart House. Defendant Berl Friedman has acted as GHDF's agent.

The Congregation has received from HUD development financing pursuant to

1. Complaint, ¶ 42.

Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q, and will receive tenant rent subsidy funding pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f. These applications for federal funding engaged the supervisory responsibilities of HUD's New York regional office. HUD is charged with administering these federal programs in accordance with the statutory commands of Congress and implementing regulations drafted by HUD.

Congress has also laid upon HUD the affirmative duty to prevent discrimination in housing, and to administer programs which will provide fair housing in accordance with the policies of the civil rights acts. These latter include Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 (also known as the "Fair Housing Act", and hereinafter referred to as "Title VIII"); and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* ("Title VI").

Plaintiffs invoke these housing and civil rights statutes, as well as HUD rules and regulations. They also assert claims under earlier civil rights statutes, 42 U.S.C. §§ 1981–1986; § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the thirteenth and the fourteenth amendments to the Constitution; and, under pendent jurisdiction, the New York State human rights law, § 296(2)(a) of the New York State Executive Law.

The gravamen of plaintiffs' complaint against the private defendants is that they intentionally discriminated against elderly Hispanic individuals in marketing Goodheart House; unlawfully declared certain handicapped individuals ineligible; and, in furtherance of a discriminatory intent, they unlawfully made selections from the applicant pool.

Plaintiffs charge the federal defendants with failing to detect, or permitting the private defendants to perform, these illegal acts. Plaintiffs assert that HUD violated the governing statutes and its own regulations, while at the same time proceeding under invalid procedural rules.

## II.

Plaintiffs make three discrete charges, although they say each is indicative of an overall discriminatory scheme on the part of the private defendants. The first charge relates to the manner in which Goodheart House was marketed. The second relates to the limitations placed upon handicapping conditions for residential eligibility. The third relates to the manner in which the private defendants selected and "logged in" those applicants who responded to the marketing program.

### A.

Plaintiffs complain that the private defendants did not, as part of their marketing plan for Goodheart House, advertise the project in Spanish-language newspapers and other media, or employ other special efforts to reach the Hispanic community. The private defendants admit the charge, but say that such advertising was not required of them. In that they are supported by the federal defendants.

At issue here is a Section 202 sponsor's obligation under the federal regulatory system to make special outreach efforts to those groups least likely to apply for the particular project. The parties agree that a section 202 sponsor must meet this obligation in a manner consistent with federal fair housing policy as articulated in Title VIII.

Title VIII declares it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. § 3604 makes it unlawful:

"(a) To refuse to sell or rent after the making of a bona fide offer or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex or national origin.

The Secretary of HUD is directed to "administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." § 3608(d)(5). Rulemaking power is delegated to the Secretary by 42 U.S.C. § 3535(d).

HUD responded to this mandate by promulgating Affirmative Fair Housing Marketing regulations ("AFHM regulations"), 24 C.F.R. § 200.600 *et seq.*, which are further explicated in HUD's "Affirmative Fair Housing Marketing Requirements Handbook" (the "Handbook"). An AFHM marketing plan must be submitted to the regional HUD office as part of a sponsor's application for these federally assisted programs. Defendants submitted such a plan in the case at bar.

HUD's fair housing marketing policy is generally articulated in the regulations at 24 C.F.R. § 200.610:

"It is the policy of the Department to administer its FHA housing programs affirmatively, as to achieve a condition in which individuals of similar income levels in the same housing market area have a like range of housing choices available to them regardless of their race, color, religion, sex, or national origin. Each applicant for participation in FHA subsidized and unsubsidized housing programs shall pursue affirmative fair housing marketing policies in soliciting buyers and tenants, in determining their eligibility, and in concluding sales and rental transactions."

Section 200.620(a) in more specific terms requires "all applicants for participation in FHA subsidized and unsubsidized housing programs to:

"Carry out an affirmative program to attract buyers or tenants, regardless of sex, of all minority and majority groups to the housing for initial sale or rental. An affirmative marketing program shall be in effect for each multifamily project throughout the life of the mortgage. Such a program shall typically involve publicizing to minority persons the availability of housing opportunities regardless of race, color, religion, sex or nation-al origin, through the type of media customarily utilized by the applicant, including minority publications or other minority outlets which are available in the housing market area. All advertising shall include either the Department-approved Equal Housing Opportunity logo or slogan or statement and all advertising depicting persons shall depict persons of majority and minority groups, including both sexes."

To ensure compliance with that regulation, each applicant must submit for approval to HUD's Fair Housing and Equal Opportunity division ("FH & EO") an Affirmative Fair Housing Marketing Plan ("AFHM Plan"), which the FH & EO may monitor and modify if it thinks necessary. 24 C.F.R. 108.20(b).

The concept of special outreach to those groups least likely to apply to a particular project appears to have been first expressed in the HUD Handbook, which has gone through several editions. The June 1973 edition of the Handbook says this:

"Equal Opportunity staff shall review the affirmative marketing plan and provide any necessary assistance to the applicant to insure that the plan is designed to attract persons from all eligible groups to the specific location, including whites and members of minority groups—Negro/Black, Spanish-American, Oriental, American Indian, or other groups in the [Standard Metropolitan Statistical Area] SMSA or housing market area which are subjected to housing discrimination on the basis of race, color, religion or national origin.

The plan should take into consideration the percentage of minority persons at the appropriate income level in the SMSA or, where there is no SMSA, in the housing market area, and the racial and ethnic composition of the specific area in which the housing is located.

The program indicated by the plan should include efforts to reach those persons who traditionally would not have been expected to apply for the housing. For housing located in predominately white areas, it will normally be necessary

to make special efforts to make its availability known to minorities; similarly, for housing in areas of minority concentration, special efforts may be needed to make its availability known to whites."

The 1982 edition of the Handbook (currently in use) identifies the four following "minority" groups: Black, American Indian or Alaskan Native, Hispanic, and Asian or Pacific Islander. P. 1–10. In formulating its affirmative marketing program the applicant is directed to:

"a. Identify the segments of the eligible population which are least likely to apply for housing without special outreach because of such factors as neighborhood customs, price, institutionalized discrimination in the housing market and other factors which have the effect of denying housing choice.

b. Outline an outreach program which includes special measures designed to attract those groups identified as least likely to apply and other efforts designed to attract persons from the total eligible population, including, for Section 8 projects, those persons identified in the Housing Assistance Plan as expected to reside in the community because of present or planned employment."

HUD's Regional New York Office, in its notice No. 85–32 dated December 29, 1985 stated further on this subject:

"Owners must comply with the marketing as stated in the HUD approved Affirmative Fair Housing Marketing Plan making outreach to the least likely to apply groups. In advance of marketing to other prospective tenants, the Owner shall market to families and those expected to reside in the Community who are least likely to apply. Additional marketing may be done at the discretion of the Owner."

The present defendants, in submitting their AFHM Plan to the HUD regional office, stated that the project was located in a racially mixed area, and identified two minority groups, Black and Asian or Pacific Islander, as least likely to apply for the project without special outreach efforts.

The Congregation proposed to outreach to these two groups through specific ethnic newspapers serving the Black and Asian population of New York City, and through sending notice of the project to community groups.

In identifying these two groups as least likely to apply, the Congregation focused upon the census tract in which Goodheart House would be located. Because of a typographical error, the Congregation identified that tract to HUD as 425. Researching the population figures for tract 425, HUD determined that the population is 87% Hispanic, 10% White, and 3% Black, and 0% Asian. In point of fact, the correct census tract number was 525. For tract 525 the population is 49% Hispanic, 43% White, 4% Black and 1% Asian. *See* declaration of Thomas White, HUD FH & EO officer in charge of the Goodheart House application.

The census for the City as a whole is 49% White, 20% Hispanic, 3% Asian, 3% American Indian and 25% Black.

On the basis of the mistaken tract 425 figures, White's office approved the Congregation's identification of Blacks and Asians or Pacific Islanders as those groups least likely to apply to Goodheart house, and therefore in need of special outreach efforts. But White says, in his declaration at ¶ 18, that his office would have reached the same result on the tract 525 figures. This appears plausible, given the population figures summarized above.

HUD's regional office approved the Congregation's AFHM Plan in March 1984. The private defendants sent letters to Black and Asian community groups and ran newspaper advertisements in the Black and Asian press, following a timetable also approved by HUD. No comparable actions to reach the Hispanic community were taken, because the Congregation had not identified Hispanics as persons least likely to apply to the project and HUD had accepted that evaluation.

Plaintiffs contend that the applicable statutes and regulations required that Goodheart House be specially marketed in Spanish-language media.

### B.

Plaintiffs complain that handicapped applicants to Goodheart House are limited to "mobility impaired" individuals. That limitation is said to be constitutionally infirm, and contrary to the statutes and regulations.

HUD has promulgated "minimum property standards" for § 202 housing projects for the elderly. In connection with those standards, HUD has promulgated "revised submission requirements." The pertinent standards and requirements appear as exhibits to the declaration of Rochelle Printz, Chief of the Assisted Housing Management Branch of HUD's New York regional office. The submission requirements recite:

"For projects for the elderly, it may be necessary to design some of the units to permit access and use by a person in a wheelchair. The Borrower should determine the need for accessible units as indicated by local needs assessments conducted by local governing bodies and State and the HUD office; otherwise, sponsors of projects for the elderly are required to make 10 percent of the units accessible to wheelchair users."

HUD requires that § 202 projects for the elderly make these accessible units available to non-elderly, as well as elderly individuals. That is to ensure that the accessible units required by the minimum property standards are utilized by persons who can benefit from them. Experience has shown that in many of the § 202 elderly projects, some of the accessible units required by the minimum property standards were not being occupied by mobility impaired persons. Printz declaration at ¶ 17.

In compliance with these requirements, the private defendants have included six accessible units in Goodheart House. The final version of the project tenant selection plan, approved by HUD as the regulations required, stated in respect of the specially accessible units:

"Handicapped persons. Mobility-impaired applicants will receive preference for those units containing special design features for the physically handicapped."

A "mobility impaired" person was defined as:

"Any adult having a mobility impairment which is expected to be of long-continued and indefinite duration, is a substantial impediment to his or her ability to live independently, and is of a nature that such ability could be improved by more suitable housing conditions, or by use of the special amenities available in the specialized units for the mobility impaired."

Section 202 of the Housing Act of 1959 declares as its purpose federal assistance "to provide housing and related facilities for elderly or handicapped families." 12 U.S.C. § 1701q(a)(1). The term "handicapped" is defined in § 1701q(d)(4):

"a person shall be considered handicapped if such person is determined, pursuant to regulations issued by the Secretary, to have an impairment which (A) is expected to be of long-continued and indefinite duration, (B) substantially impedes his ability to live independently, and (C) is of such a nature that such ability could be improved by more suitable housing conditions. A person shall also be considered handicapped if such person is a developmentally disabled individual as defined in section 2691(1) of Title 42."

HUD has dealt further with these definitions in a Handbook for sponsors of a Section 202 direct loan program for housing for the elderly or handicapped (the "202 Handbook") and in two memoranda promulgated by the Assistant Secretaries for Housing in 1983 and 1984. The first of these is a June 7, 1983 memorandum to all HUD regional and field offices from Philip Abrams, then Assistant Secretary for Housing. The second is a March 30, 1984 memorandum to all HUD regional and field offices from Maurice Barksdale, then the Assistant Secretary for Housing. The relevant definitions from the 202 Handbook are quoted in the Printz Declaration at ¶ 18. The Abrams and Barksdale memoranda appear as exhibits F and G to that declaration.

The Handbook, consistent with the statute itself, requires that for housing act purposes a physical handicap must be of such a nature that the impediment to the resident's ability to live independently "could be improved by more suitable housing conditions." The Handbook goes on to further define individuals handicapped by a "developmental disability" and those who are "chronically mentally ill."

The Abrams memorandum of June 7, 1983 defines the populations eligible for service under the Section 202 program as the "elderly, physically handicapped, developmentally disabled or chronically mentally ill." The supplemental memorandum issued on March 30, 1984 by Abrams' successor, Assistant Secretary Barksdale, says this:

"This Section 202 program is designed to serve persons who are either elderly or handicapped, and there are three distinct types of handicapped persons for Section 202 purposes—the physically handicapped (e.g., mobility impaired); the developmentally disabled; and the chronically mentally ill."

The Barksdale memorandum goes on to observe:

"There are thus actually four separate groups of persons eligible for Section 202 assistance, and each group has distinct needs. For example physically handicapped persons need specially designed surroundings compatible with wheelchairs and other prosthetic devices, while the developmentally disabled and the chronically mentally ill require special support services not necessary or appropriate to either the elderly or physically handicapped."

So far as I can ascertain, the explicit equation of "physically handicapped" with "mobility impaired" appears for the first time in the memorandum of Assistant Secretary Barksdale.

Plaintiffs contend that limiting handicapped applicants to Goodheart House to those who are "mobility impaired" is unlawful.

## C.

In a reply brief filed after expedited discovery had taken place plaintiffs argue that the "logging in" of timely applications had been conducted in a procedurally flawed manner.

It is the private defendants who conducted these procedures, in furtherance of responsibilities squarely placed upon them by the federal regulatory scheme. The private defendants dispute plaintiffs' allegations of procedural wrongdoings, but have stated through their counsel a willingness to repeat the process. Oral argument June 23, 1987 at Tr. 25–26.

## III.

Before addressing the merits of Plaintiffs' motion, certain preliminary points must be considered.

The first is a challenge by the federal defendants to this Court's subject matter jurisdiction. That challenge, grounded in the concept of sovereign immunity, is not available to the private defendants.

The federal defendants contend that none of the housing or civil rights statutes relied upon by plaintiffs contains a waiver of the federal government's sovereign immunity. Judicial review of the federal defendants' actions in this case, they contend, is sanctioned only by the Administrative Procedure Act, 5 U.S.C. §§ 702 et seq., which plaintiffs have not cited in their complaint.

Plaintiffs respond that subject matter jurisdiction against the federal defendants lies under the cited statutes. Plaintiffs also rely upon the mandamus statute, 28 U.S.C. § 1361. Lastly, they ask leave in case of need to amend the complaint so as to assert a claim under the Administrative Procedure Act.

■ I agree with the federal defendants that the United States has not consented to be sued under Title VIII or Title VI of the Civil Rights Acts. Judge Sand reached that conclusion in *United States v. Yonkers Board of Education,* 594 F.Supp. 466, 470–73 (S.D.N.Y.1984), in an analysis with which I concur.

The federal government's amenability to suits under 42 U.S.C. §§ 1981 and 1982 presents a closer question,[2] although in the view I take of the case I need not decide it.

■ Where, as here, a plaintiff charges a federal agency with a constitutional or statutory violation, mandamus is an appropriate remedy for equitable relief.[3]

To the extent that the present plaintiffs' claims do not rise to that level, the Administrative Procedure Act also sanctions equitable relief. 5 U.S.C. § 702 (action under the statute lies where plaintiff seeks "relief other than money damages"); *Yonkers, supra* at 469; *cf. Hills v. Gaultreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

■ The Administrative Procedure Act, at 5 U.S.C. § 706, makes judicial review available to the sort of claims the present plaintiffs assert against the federal defendants.[4] At this early stage of the litigation, and the federal defendants neither suggesting nor demonstrating any prejudice, I grant plaintiffs' speaking motion to amend their complaint so as to invoke the Administrative Procedure Act.

It follows that this Court has subject matter jurisdiction over plaintiffs' claims against the federal defendants.

## IV.

Another threshold question relates to the showing the present plaintiffs must make to obtain a preliminary injunction.

The criteria for obtaining a preliminary injunction in this circuit are well settled. It is generally said that the party seeking preliminary injunctive relief must show irreparable harm, and then satisfy either one of two prongs: the likelihood of success on the merits; or sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly towards the moving party. *See, e.g., Union Carbide Agricultural Products v. Costle,* 632 F.2d 1014, 1017 (2nd Cir.1980), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981).

In the case at bar, both private and federal defendants argue that plaintiffs must meet the more onerous standard of demonstrating the likelihood of success on the merits. For this proposition they cite the *Union Carbide* case where, after reciting the familiar two-pronged standard, the Second Circuit went on to say at 1018:

"When Congress authorizes or mandates governmental action that is in the public interest, more than 'a fair ground for litigation' must be shown before the ac-

---

2. The United States and its agencies are subject to suit only if the Government's sovereign immunity has been waived for the cause sought to be asserted. *U.S. v. Sherwood,* 312 U.S. 584, 587, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941). Most courts that have considered whether HUD is amenable to suit under the civil rights statutes have determined that 12 U.S.C. § 1702, which waives HUD's immunity to suit, does not extend to alleged civil rights violations. *See Selden Apartments v. United States Department of Housing and Urban Development, et al.,* 785 F.2d 152 (6th Cir.1982) (§ 1702 does not waive sovereign immunity for alleged violations of §§ 1981, 1982); *Unimex v. HUD,* 594 F.2d 1060 (5th Cir.1979) (§ 1702 does not waive sovereign immunity for alleged violations of §§ 1981, 1982, 1986); *U.S. v. Yonkers Board of Education,* 594 F.Supp. 466, 471 (1984) (§ 1702 does not waive sovereign immunity for civil rights actions against HUD). *But see Baker v. F & F Investment Company,* 489 F.2d 829 (7th Cir. 1973) (Thirteenth Amendment acts as a waiver of sovereign immunity for §§ 1981, 1982 actions against HUD; no strict application of § 1702 analysis).

3. While federal courts can "always inquire as to whether an agency's reasons for acting were unconstitutional or in clear violation of a statutory mandate[,] they are not universally free to ask whether those reasons were wise, rational, relevant or supported by the avaiable evidence." *Alan Guttmacher Institute v. McPherson,* 597 F.Supp. 1530, 1534 (S.D.N.Y.1984). The latter type of review is available by statutory grant only, which in this case is found in the Administrative Procedure Act (APA). The scope of review accorded by the APA is set out in 5 U.S.C. § 706, which provides, *inter alia,* that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege or immunity; (c) in excess of statutory jurisdiction, authority, or limitations or short of statutory right; (d) without observance of procedure required by law...."

4. See footnote 3, *supra.*

tion will be stopped in its tracks by court order."

It is necessary to consider the factual context in which the Second Circuit made that statement. Plaintiffs in *Union Carbide* were private pesticide manufacturers required by federal law to submit certain test data to a federal agency, the Environmental Protection Agency, for every pesticide they produced. The EPA, in turn, was authorized to release the data to the public with the exception of "trade secret information." Plaintiffs sued the EPA, seeking an injunction against release of information which they considered covered by the "trade secret" exception, but which the EPA routinely released. During the pendency of the suit, Congress amended the appropriate legislation, explicitly adopting the agency's view.

Not surprisingly, plaintiffs failed to obtain a preliminary injunction against the EPA. In Judge Friendly's subsequently expressed view, *Union Carbide* stands for the proposition that the more rigorous "likelihood of success" standard "should be applied when an injunction is sought against a sovereign." *Mitchell v. Cuomo*, 748 F.2d 804, 810 (2nd Cir.1984) (Friendly, C.J., dissenting).

*Union Carbide* bears no controlling resemblance to the case at bar. Here plaintiffs seek an injunction against marketing and renting procedures followed by the private defendants, who bear responsibility for such activities. Secondly, to the extent that government action is sought to be enjoined indirectly, the present plaintiffs, far from seeking to protect a proprietary trade secret, allege constitutional and statutory violations. Confronting a comparable situation in *Dixon v. Heckler*, 589 F.Supp. 1494, 1501 (S.D.N.Y.1984), Judge Lasker said:

> "We believe in litigation such as this, no party has an exclusive claim of the public interest, and accordingly we doubt the appropriateness of applying the standard of *Union Carbide*."

Judge Lasker then found a likelihood of success in *Dixon*, and so his observation is *dictum;* but it has a logical appeal, since

assuming *arguendo* the private defendants and HUD are violating statutory mandates and constitutional principles in respect of Goodheart House, it is the plaintiffs and not they who speak for the public interest. Arguably the Second Circuit has adopted this view *sub silentio* in *Patchogue Nursing Center v. Bowen*, 797 F.2d 1137, 1141–43 (2d Cir.1986) (reviewing denial of preliminary injunction sought by private plaintiff against federal Department of Health and Human Services under the traditional two-pronged standard).

■ In the case at bar, I apply that two-pronged standard.

Defendants faintly suggest a failure to make the initial showing of irreparable harm. Their contention may be sound with respect to certain named plaintiffs who would not in any event qualify, under age and income limitations, for residence in Goodheart House. But not all of the named plaintiffs may be so easily disposed of; and if plaintiff's statutory and constitutional theories are correct, it is apparent that certain of the named plaintiffs, as well as members of the proposed class, are able to demonstrate irreparable injury arising out of discriminatory housing procedures.

Against this background, I turn to the merits of the litigation.

## V.

With respect to the private defendants' marketing of Goodheart House, the thrust of plaintiffs' claim is that of intentional racial and religious discrimination. The private defendants' conduct, plaintiffs allege, is intended to achieve the goal that "most, if not all, of the apartments at Goodheart House ... be rented to a tenant population that is disproportionately White, Jewish Orthodox, and Hasidic." Plaintiffs Main Brief at 16.

Plaintiffs perceive in the Goodheart House project a continuation of Williamsburg-area, public housing discriminatory practices with which Judge Tenney dealt in *Williamsburg Fair Housing Committee v. New York City Housing Authority*, 450 F.Supp. 602 (S.D.N.Y.1978), and 493

F.Supp. 1225 (S.D.N.Y.1980). Indeed, the present plaintiffs make much of the peripheral involvement in that earlier case of an individual presently affiliated with the Congregation.

In *Williamsburg,* Judge Tenney properly, indeed inevitably, found discriminatory intent and effect in respect of a publicly financed housing project where the owners specifically instructed the renting agent "to rent Bedford Gardens 75% to Whites, 20% to Hispanics and 5% to Blacks." 493 F.Supp. at 1225. Elaborate procedures were built into the rental scheme to establish and maintain that racial ratio. While HUD was involved in the *Williamsburg* project, its only involvement was "through the receipt and approval" of a marketing plan "which did not authorize a developer to use race as a quota." *Id.* at 1243. The rigid ratio renting quotas imposed by the project owners in the *Williamsburg* litigation were without HUD's knowledge or consent.

In respect of the marketing of the Goodheart House project, the present plaintiffs offer no persuasive evidence of discriminatory intent. The private defendants submitted a marketing plan to the regional office of HUD, as required by regulations. On the basis of the community's demographic profile, the project sponsors recommended to HUD affirmative outreach efforts to certain minorities and not to others. There was a plausibility to the private defendants' plan. The federal defendants accepted that plan, concluding in doing so that the plan complied with the agency's own regulations. It is difficult to see how private developers bent upon invidious discrimination would seek to further their objective by making full disclosure of their procedures to the federal regulatory agency, and then complying with the agency's directions. Theoretically HUD could have been a knowing and intentional participant in a discriminatory scheme; but the plaintiffs do not go so far as to suggest that is the case.

■ Accordingly I cannot regard the private defendants' choice not to advertise Goodheart House in Hispanic media, or to conduct other special outreach to that community, as evidence of an intent to discriminate against Hispanics. The gap in plaintiffs' proof is not filled by the private defendants' conceded, one-time placing of an advertisement in a Jewish newspaper. The outreach to the Black and Asian communities as approved by HUD was far more extensive; and the regulations permit such other advertising as the sponsor may elect.

Lack of intent defeats the constitutional claims of discrimination in marketing. *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).[5]

This does not end the inquiry. The statutory claims remain. "To prove a prima facie case of national origin or racial dis-

---

5. I recognize that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Arlington Heights, supra,* 429 U.S. at 266, 97 S.Ct. at 564. Plaintiffs in the case at bar argue that the factors identified in *Arlington Heights* as possibly probative of discriminatory intent all support their contention that the Goodheart House marketing plan was motivated by discriminatory intent. I reject this contention, as the text makes clear. There is no evidence of discriminatory effect of the marketing plan so stark as to be "unexplainable on grounds other than race", *ibid.,* nor are the historical facts of past discrimination in housing dealt with in the *Williamsburg* case probative of "a series of ... actions taken for invidious purposes" which would support an inference that the defendants structured this market- ing effort to exclude members of the purported plaintiff class. Furthermore, although plaintiffs complain of several irregularities in the office and telephone procedures the Congregation employed in executing the marketing plan, these irregularities do not constitute "[d]epartures from the normal procedural sequence ... [that] afford evidence that improper purposes are playing a role." 429 U.S. at 267, 97 S.Ct. at 564. The majority of irregularities, such as the alleged failure to have the telephone number listed on the fair housing poster answered by staff trained in HUD fair housing procedures, evidence nothing more than carelessness on the part of the Congregation towards all potential applicants. They do not, in my view, support an inference that the marketing plan was conceived with an invidious purpose toward any particular group.

crimination under Title VIII, plaintiffs need only demonstrate that the challenged actions had a discriminatory effect; they need not demonstrate discriminatory intent." *Williamsburg, supra,* at 493 F.Supp. 1245.

The private defendants' representatives have said by affidavit that 242 timely applications for the project were received at the post office box designated, pursuant to HUD procedures, to receive them. Of those timely applications, 43% were from Blacks, 17% from Whites, 15% from Hispanics, 6% from Asians, 1% from American Indians, and 16% were from persons of unidentified race or ethnic background. Those 242 applications were further broken down on the basis of eligibility under the age, income level, family size and mobility impairment requirements. The eligible applications are as follows: 41 (or 34%) from Whites, 32 (or 27%) from Blacks, 27 (or 23%) from Hispanics, 13 (or 11%) from Asians, and 6 (or 5%) from persons of unidentified race or ethnic background. Supplemental affidavit of Gertrude Friedman dated June 29, 1987 at ¶¶ 2, 3. A qualified expert, having reviewed census and economic data for census tract 525, concludes that in that area of the City's population, "non-Hispanic seniors are close to twice as likely to fall below the poverty line as Hispanic seniors." Ritterband affidavit dated June 29, 1987 at ¶ 8.

■ There is nothing in the record to refute these statistics. I regard them as fatal to plaintiffs' claim of discriminatory effect in marketing Goodheart House.

Accordingly plaintiffs can succeed on this aspect of the case only if they demonstrate that, under the statutory and regulatory scheme, the private defendants were required to conduct special outreach to the Hispanic community; that the federal defendants were required to require the private defendants to do so; and that these compounded failures mandate a remarketing of the project from scratch.

In approving the private defendants' marketing plan, HUD undertook to interpret the fair housing statutes it is charged to administer, and the regulations it promulgated in response to that obligation.

The statutes themselves, while declaring broad anti-discriminatory fair housing policies, have delegated regulatory responsibility to HUD. With particular reference to this case, the statutes do not direct the manner in which federally subsidized housing programs shall be advertised to the community at large. As we have seen, HUD has promulgated regulations on that subject, and acted further to interpret its own regulations.

The Second Circuit has recently held that in such circumstances, the question "is not whether there are plausible alternative views, but rather whether the Secretary's views are reasonable", *Biggs v. Lyng,* 823 F.2d 15, 19 (2d Cir.1987). In *Biggs* Judge Mahoney cited and quoted from *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), where the Supreme Court said:

"If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

■ I am not prepared to condemn as unreasonable HUD's limiting of the private defendants' extended special outreach efforts to Blacks and Asians in respect of a project to be built in a census tract which is 49% Hispanic. The federal program's avowed purpose is "to reach those persons who traditionally would not have been expected to apply for the housing", 1973 Handbook, which goes on to observe that this will necessitate special efforts to make a project's availability known to minorities

if it is built in a predominantly white area, and vice-versa.

This is a reasonable interpretation by HUD of the statutes' mandate. In *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1134 (2d Cir.1973), the Second Circuit characterized Title VIII as requiring regulatory agencies to take action "to fulfill as much as possible the goal of open, integrated residential housing patterns and to prevent the increase of segregation, in ghettos, of racial groups whose lack of opportunities the Act was designed to combat." The Second Circuit in *Otero* found support for that conclusion in the words of Senator Mondale, a draftsman of Title VIII, who emphasized that the statute was designed to replace the ghettos "by truly integrated and balanced living patterns." *Ibid.*

Given these statements, I am not persuaded by the plaintiffs' principal criticism, namely, that HUD relied on the "purely numerical basis" of the census tract figures. Plaintiffs' reply memorandum at 10. Given the policy of special outreach to those "least likely to apply," this is the logical place to start.

Plaintiffs argue that neither the private nor the federal defendants gave sufficient consideration to additional factors listed in the HUD Handbook which, in plaintiffs' view, required special outreach to the Hispanic community. Quotations from the Handbook appear in Plaintiffs' Reply Brief at 10. The "racial/ethnic composition" of the "neighborhood (census tract) in which the project ... will be located" is one of the factors. Given the high proportion of Hispanic residents in the census tract in question, that factor argues against, and not for, special outreach to the Hispanic community, as HUD's practices specifically recognize. There is also a reference in the Handbook to the "possible existence of practices or policies of discrimination" against members of particular groups. Plaintiffs point to the *Williamsburg* litigation before Judge Tenney as a basis for requiring special outreach to the Hispanic community in the case at bar. But the renting practices revealed by the *Williams-*

*burg* litigation as having occurred during 1975–1977 were entirely different in nature, and their effect is now attenuated by the passage of time. I construe the Handbook's reference to the possible existence of *present* discriminatory practices or policies which may need to be addressed by special outreach. While it is true that the Handbook refers generally to "the effects of the language barrier upon potential homeseekers whose native language is not English," and the sign posted at the project site was only in English, the significant number of Hispanic applicants for Goodheart House, both timely and eligible, indicates with that clarity bestowed by hindsight that the private and federal defendants at bar were correct in declining to identify Hispanics as individuals "least likely to apply" to this particular project, and thus requiring special outreach.

I accept the probability that advertising the project in Hispanic media and special communications to community groups and city agencies dealing with this segment of the population would have called the project's existence to a greater percentage of the Hispanic minority than was achieved by this marketing plan. However, to sustain HUD's action I need not conclude that it was the only permissible choice open to it, or even that this Court would have approved the marketing plan had it been initially presented to the Court. *Biggs, supra*, at 18. The federal defendants' approval of the private defendants' marketing plan is entitled to judicial deference, and may be condemned so as to require remarketing only if I find the agency action arbitrary, capricious, manifestly contrary to statute or controlling regulation, or otherwise unreasonable. While 24 C.F.R. § 200.620(a) recites that an affirmative marketing program "shall typically involve publicizing to minority persons the availability of housing opportunities", I cannot condemn as unreasonable or otherwise legally impermissible HUD's application of its "least likely to apply" formula to the particular facts of this case. "Typical" means "unexceptional." Roget's International Thesaurus (3rd ed. 1962) at 39. The

regulation does not foreclose the agency's present action.

The proverbial bottom line is that in a census tract with a population of 49% Hispanic and 43% White residents, with minimal Black and Asian representation, the private and federal defendants decided to launch a special effort in the direction of the Black and Asian populations, thereby achieving applicant and eligibility pools which, while preserving substantial White and Hispanic representation, also significantly increased Black and Asian participation. I find no constitutional, statutory, or regulatory violation in a marketing plan producing these results.[6]

## VI.

■ There is no substance to plaintiffs' attack upon the limitation of handicapped applicants to those who are "mobility impaired" as HUD has defined that term.

It is now well established that the Housing Act of 1959, of which section 202 provides a federal funding source, "clearly permits HUD to approve a loan to any single sponsor who wishes to build housing only for the elderly or only for some class of handicapped persons or for a combination of eligible groups. A sponsor need not serve *all* eligible needy groups." *Brecker v. Queens B'nai B'rith Housing Development*, 798 F.2d 52, 56 (2nd Cir.1986) (emphasis in original). The Tenth Circuit has reached the same conclusion. *Knutzen v. Eben Ezer Lutheran Housing Center*, 815 F.2d 1343, 1349 (10th Cir.1987).

It follows that handicapped persons have no right to apply to those units set aside in Goodheart House for the handicapped solely on the basis of their handicapping condition, whatever its nature.

No such claim arises under section 504 of the Rehabilitation Act of 1973, which forbids discrimination "solely by reason of his handicap" to an "otherwise qualified handicapped individual" in respect of federally funded programs. 29 U.S.C. § 794. Within the context of federally assisted housing, section 202 of the Housing Act of 1959 specifically defines the term "handicapped" as a person with an impairment "of such a nature that such ability [to live independently] could be improved by more suitable housing conditions." 12 U.S.C. § 1701q(d)(4)(C). It is well settled that a general civil rights statute, such as section 504, "will not be construed so as to repeal or revoke another more particular statute, regardless of the priority of enactment absent express language by Congress stating its intent to revoke or repeal that statute." *Knutzen, supra,* at 1353, quoting with approval District Judge Platt's analysis in *Brecker* at 607 F.Supp. 436. The Tenth Circuit went on to observe in *Knutzen* that "§ 504 was not intended to be used as a 'sword' with which the handicapped may carve a share from every federal benefit program." *Id.* at 1353–54. The Second Circuit specifically approved Judge Platt's analysis in affirming his order. 798 F.2d at 57.[7]

I appreciate that the present plaintiffs seek to paint with a finer brush. They say that the sub-class of "physically handicapped" individuals cannot be validly further sub-divided into those individuals whose handicapping conditions render them "mobility impaired."

I agree with plaintiffs that the *Brecker* litigation did not squarely address that issue. However, the Tenth Circuit in *Knutzen* came very close to doing so, observing that the named plaintiff, in addition to suffering from mental impairments, "also has physical impairments although she is not mobility impaired." 815 F.2d at 1346. But the rationales of *Brecker* and *Knutzen,* when considered in the light of *Chevron* and *Biggs, supra,* demonstrate that HUD's interpretation is invulnerable to challenge.

As noted, the explicit definition of the physically handicapped within the housing

6. While I have considered the other perceived marketing irregularities upon which plaintiffs rely, I find them of no more significance in the statutory context than in the constitutional one. *See* footnote 5, *supra.*

7. The more specific definitions of handicaps in the Housing Act also serve to demonstrate that the present plaintiffs are not "otherwise qualified" under the Rehabilitation Act.

context as the "mobility impaired" was first articulated in the Abrams and the Barksdale memoranda. The present plaintiffs faintly suggest that these memoranda have no legal effect because they were not published in the Federal Register, thus violating the Administrative Procedure Act, 5 U.S.C. § 552. The Second Circuit and Tenth Circuit have squarely rejected that argument in respect of these very memoranda. *Brecker* at 56–57; *Knutzen* at 1351.

Publication was not required, those courts held, because the Abrams and Barksdale memoranda did not "constitute a change in any rule or policy of HUD's in regard to § 202." *Knutzen* at 1351. Nor does the interpretation articulated in these memoranda contradict the statute itself. On the contrary: it is Congress that limited handicapping conditions for housing purposes to those impairments whose effects "could be improved by more suitable housing conditions." There are a number of physical handicaps which do not require wheelchairs, and would not be relieved by the special access units which are set aside for the mobility impaired in Goodheart House. That is demonstrated by the situation of some of the plaintiffs at bar.

I see no basis for affording plaintiffs relief on this aspect of their claims.

## VII.

Plaintiffs' final challenge relates not to the marketing program for Goodheart House, but rather to the procedures followed after that program produced the pool of 242 timely applications discussed *supra*.

I have previously noted that under HUD regulations, applicants for projects such as these are directed to forward their applications to a designated post office box. The regulations specifically forbid the filing of applications at the construction site or at the sponsor's office.

In section 8 rent subsidy projects such as Goodheart House, the sponsors are also directed to follow HUD's written "rent-up procedures," a copy of which appears as Exhibit C to the Printz declaration. Picking up at the time when the deadline for mailing in applications has arrived, the rent-up procedures provide in part as follows:

"1. *Receipt of Applications:* Applications must remain in the Post Office Box and be picked up by the Owner/Managing Agent one day *after the deadline date* stated in the advertisement.

2. *Applicant Log:* The applications will be brought to the project office where they will be placed in an open area or flat receptacle and *thoroughly mixed.* A responsible official of the Owner/Managing Agent and two (2) impartial witnesses of the Owner's choosing must be present during the selection of envelopes. Each envelope will be randomly selected and handed to a responsible staff person who will open and *staple the envelope to the application,* number, date, and time-stamp the application, and enter *in ink* into a *permanently bound log,* the following information: applicant name, address and numerical order. Any type of "white out" or erasure which eliminates the person's name or status is *not permitted.* Errors may be corrected only by drawing a line through the person's name and having the staff member initial the correction.

3. *Logging:* Once the logging of applicants' names and numbers is completed for all applications, the Owner/Managing Agent will record the remaining items in the log for each applicant, i.e., date and time received, eligibility information, priority standing, race, etc. This information *must* be entered into the log *prior* to the tenant selection process which follows.

4. *Subsequent Applications:* All applications received after the deadline date are to be picked up from the post office and also numbered, dated, time-stamped and entered into the log. A line shall be drawn in the log to separate this group from those received by the deadline date. The Owner/Managing Agent must retain the Post Office box for 14 days following the date applications were originally picked up from the post office."

(Emphasis in original).

The written procedures then go on to describe the manner in which tenant selection shall be accomplished. I need not quote those provisions at length.

There is cause in the case at bar for substantial concern with respect to the private defendants' compliance with the procedures which I have quoted.

Those concerns arise initially from statistics which offer a startling contrast to the applicant pool profile previously discussed.

The deadline for applying to Goodheart House was December 15, 1986. As the evidence shows, defendant Berl Friedman collected the timely applications from the designated post office box on December 16. The quoted procedures indicate what should have been done next, including the mixing, random selection, and careful logging in a bound log of particular details with respect to each applicant.

On January 29, 1987, two representatives of White's FH & EO compliance unit visited the site and project office to monitor the project and ensure the Congregation's compliance with the approved marketing plan and related procedures. That monitoring included interviews with Gertrude Friedman, wife of Berl Friedman and the renting agent, and a consultant hired by the Congregation to assist with the project, one Miriam Weixel. The HUD representatives examined the applications and the applicant log, and found that the headings in the log did not include information concerning time received, eligibility status, bedroom size needed, elderly, displaced, very low income, race/ethnicity, date selection/notice, order of selection, priority status, rejections and comments, all as required by HUD procedures. White Declaration at ¶ 23.

On February 20, 1987, HUD sent Weixel a letter calling her attention to these omissions, as well as to other matters with which I need not deal. HUD advised Weixel in its February 20, 1987 letter: "Before tenant selection is initiated, the detailed information required in the log must be entered for the 242 applications received." Weixel was asked to respond to that and other items within 30 days of the receipt of the letter. White declaration, Exhibit E, G. Weixel made no response whatever. HUD was required to send a follow-up letter of May 28, 1987. White declaration, Exhibit H. On June 4, 1987 Weixel responded to HUD's letters, informing the FH & EO that "the rental office was completed and the posters displayed and that all timely applications had been answered. Ms. Weixel provided HUD with a copy of the log." White declaration at ¶ 26.

Counsel for plaintiffs, having obtained a copy of the log belatedly furnished by Weixel to HUD, set forth in their reply brief at 5 the following uncontradicted statistics.

According to the log, of the first 59 names selected from the 242 timely applicants, 64% were White, 14% Asian, 12% Black and 7% were Hispanic. Of the first 120 names in the log, 56% were White, 32% Black, 16% Hispanic and 1% were Asian.

Given a total applicant pool of 242 with a White component of only 17%, the proportions of White applicants among the first 59 and first 120 names logged seem statistically suspect. I have no expert evidence on the point, but do not believe I require any.

Those in attendance at the logging-in ceremony, and the manner of their selection, also give rise to questions. The procedures are to be accomplished by a "responsible official" of the project owner or managing agent; and two "impartial witnesses of the Owner's choosing must be present during the selection of envelopes."

Berl Friedman testified at his deposition that on December 16, 1986, he and his wife Gertrude Friedman, the Congregation's rental agent for the project, picked up the applications at the post office and then proceeded by car to the construction site at 166 South 9th Street. Tr. 72. The envelope opening and logging-in ceremony then took place. Present were Berl Friedman; Gertrude Friedman; a woman Berl Friedman initially identified only as "Mrs. Singer"; a Mrs. Schwartzman; and a man named Juan Medina. Tr. 73. Mrs. Singer, it later developed, was the Friedmans'

daughter. Tr. 77. Mrs. Schwartzman was an employee of the Opportunity Development Association, a federally funded community development organization which has undertaken planning studies for the South Williamsburg section of Brooklyn, where "[t]he majority of the area's residents are Hasidic Jews who live much the way the founders of their movement lived in the 18th and 19th century in Europe." "South Williamsburg—A Strategy for Preserving a New York Neighborhood," prepared for Opportunity Development Association by Newman Associates (2nd Edition 1982) at 8. The Opportunity Development Association was recommended to Mr. Friedman by Hon. Abraham Gerges, a member of the New York City Council.

The two individuals who signed as impartial witnesses to the logging in procedures were Mrs. Schwartzman and Juan Medina. Of Mr. Medina, Friedman at his deposition could recall almost nothing. Medina was a "Spanish man," Friedman said. He had never met him before that day. Friedman called Medina on the telephone to ask him to come to the project site to act as a witness, but could not recall who had given him Medina's name or the telephone number at which he could be reached. Tr. 75–77.

The Court, intrigued by the sudden materialization of this mystery man, invoked Rule 614(a), F.R.Evid., and directed that he be produced to testify. Medina testified before the Court and in the presence of counsel on June 24, 1987. After stating that he lived at 248 St. Nicholas Street in Brooklyn, Medina testified as follows:

Q. How are you presently employed?

A. Can you ask that again?

Q. Yes. What is your present employment?

A. Present employment, I work for Mr. Singer, and I am an operator and a cutter and a layout.

Q. What is the name of your employer?

A. Singer.

Q. Would you spell that name?

A. I can't spell it.

Q. You pronounce it Sieger?

A. Singer, a Jewish name.

Q. Singer?

A. Yes.

Q. I see. All right. What sort of business is Mr. Singer in?

A. Clothing.

Q. Does he manufacture clothing?

A. Yes.

Q. And you are one of his employees in that work, is that true?

A. Yes.

Q. What is the address of Mr. Singer's office or factory? Where do you go to work?

A. Well, I work for him in many places. I work for him in a shop, I work for him in the store, and I work for him in my house, too.

Q. I see. What do you do for him at your house?

A. This clothing made of wool, and once the wool comes out it makes a little puffy in the material, and this have to be shaved very carefully, so it requires time, and I do it at home.

Q. Do you know Mr. Singer's first name?

A. I always know him by Mr. Singer.

Q. Sometimes you go to his shop?

A. Excuse me.

Q. Do you sometimes go to his shop?

A. Yes. I always go all around for him.

Q. Where's his shop? Where is it located?

A. On Broadway.

Q. In Manhattan?

A. In Brooklyn.

Q. In Brooklyn, all right. And did you also say you sometimes go to his factory?

A. Yes.

Q. Where's the factory?

A. Its in Brooklyn. In Williamsburgh (sic). I go to pick up clothing.

Q. How long have you worked for Mr. Singer?

A. About five years. Tr. 4–6.

Medina then testified to certain procedures which he had observed and partially participated in.

Piqued by the fact that Medina worked for a "Mr. Singer," given the status of the Friedmans' daughter as a "Mrs. Singer," the Court directed counsel for the private defendants to submit an affidavit on the point of whether there was any relationship between the Singer for whom Medina worked and the Singer whom the former Miss Friedman had married. That inquiry prompted an undated affirmation by one Miklos Singer, who identified himself as the owner of the Singer clothing company in Brooklyn, and "the one who recommended to Mr. Berl Friedman Juan Medina as a witness to the logging in ceremony at Goodheart House." ¶ 1. Mr. Singer also identified Berl Friedman as "my father-in-law as I am married to his daughter Hudy." ¶ 2.

Having dealt adequately with the Court's inquiry, Mr. Singer went on to say in his affirmation that he has known Mr. Medina for approximately "three years"; that Medina works for him only on an "occasional basis," never for more than twenty hours per week, "but that he has not done so for approximately three months ..." ¶ 3, 4. While undated, the Singer affirmation was received by the Court from defendants counsel together with an affidavit by Medina sworn to July 9, 1987.

In his July 9 affidavit Medina, displaying a polished turn of English phrase not noticeable during his testimony, states:

"I am the Juan Medina who testified in court in the captioned case on June 24. I wish to make clear that Mr. Singer is not the only employer for whom I work. In fact, I have not worked for Mr. Singer recently. Currently I am employed as a house painter in Long Island working on an apartment building. I work in the ordinary course in a variety of handyman type jobs including as a house painter, a house repairer, doing such things as plastering, as an appliance repairman repairing refrigerators, stoves and air conditioners and as clothing worker for per-

sons other than Mr. Singer. I do not depend upon Mr. Singer but in fact have other persons and jobs which I work at on a regular basis."

It is difficult to reconcile Medina's affidavit with his testimony on June 24, in which he listed only a "Mr. Singer" as his present *employer* [singular] and said he had been working for him for "about five years." It is equally difficult to accept Berl Friedman's deposition testimony that he could not remember where Medina had come from or who recommended him or gave him Medina's telephone number, when in fact Friedman received the recommendation from his own son-in-law, presumably as the result of an inquiry Friedman initiated.

■ These statistical peculiarities and eyebrow-raising credibility issues, coupled with the doubtful impartiality of the "impartial" witnesses, persuade me that plaintiffs are entitled to a reshuffling and relogging of the 242 timely applications, under HUD supervision. To that extent, and to that extent only, plaintiffs' motion for a preliminary injunction succeeds.

For the reasons previously stated, plaintiffs' motion for a preliminary injunction requiring remarketing of the Goodheart House project *ab initio* is denied. I reach that conclusion under either prong of the Second Circuit criteria for the granting or withholding of preliminary injunctive relief.[8]

## VIII.

For the foregoing reasons the Court makes the following ORDER:

1. Plaintiffs' motion for a preliminary injunction is denied, except insofar as specifically granted in the second decretal paragraph of this Order.

2. Defendants Goodheart Housing Development Fund, Inc. and Congregation Yetev Lev D'Satmar, Inc., their officers, agents, servants, employees and attorneys, and those persons in active concert or par-

---

**8.** I have considered but ultimately reject the proposition that the private defendants' more recent conduct, discussed under this Point, requires a retroactive inference of discriminatory intent, mandating an entire remarketing procedure. While significant questions arise from the post-marketing, tenant selection stage, they do not impact upon the prior, discrete marketing plan, which received the specific imprimatur of HUD and produced statistical results which give no cause for concern.

ticipation with them who receive actual notice of this order by personal service or otherwise, are preliminarily enjoined from signing and/or entering into any lease arrangements with tenants at Goodheart House until:

(a) The 242 timely applications received for Goodheart House are reassembled, again thoroughly mixed, again selected at random, and relogged. A representative or representatives of HUD, to be designated by that agency, are directed to attend this procedure. Counsel for plaintiffs are permitted to attend this procedure as observers if they wish.

(b) Following the procedures set forth in sub-paragraph (a) of this order, the tenant selection process based upon eligibility criteria will be repeated. A representative or representatives of HUD are directed to participate in this procedure. Counsel for plaintiffs are entitled to attend as observers.

(c) HUD is directed to furnish this Court with an affidavit or affidavits describing the procedures which they have attended, the actions taken and the results observed.

(d) These procedures shall be accomplished as quickly as possible.