**NATIONAL DEPOSIT GUARANTY CORPORATION, an Ohio Corporation, Plaintiff,**

**v.**

**Charles W. SAULS, Jr., et al., Defendants.**

**Civ. A. No. 84–T–464–N.**

United States District Court, M.D. Alabama, N.D.

Dec. 30, 1987.

---

**12.** It is not recommended that this be ordered.

William J. Baxley, Joel D. Dillard, Baxley, Beck, Dillard & Dauphin, Birmingham, Ala., William T. McCracken, Thomas J. Bonasera, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for plaintiff.

Terry R. Smyly, Gen. Counsel, State Banking Dept., Montgomery, Ala., for all defendants.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff National Deposit Guaranty Corporation has brought this lawsuit claiming that § 5-17-19 of the 1975 Code of Alabama, a provision governing insurance for state-chartered credit unions, violates federal statutory and constitutional law. National has sued various Alabama officials responsible for administering this law. This matter is now before the court on cross-motions for summary judgment. For reasons that follow, the court has concluded that National's claims lack merit and that summary judgment should be entered in favor of the state officials and against National.

### I.

Section 5-17-19 provides that "Every credit union shall set aside such regular reserves as are required ... in order to maintain insurance of member accounts under the provisions of Title II of the Federal Credit Union Act," 12 U.S.C.A. §§ 1781-1790. The section further provides that any Alabama credit union that has not obtained insurance in compliance with Title II or whose Title II insurance has been cancelled must either dissolve or merge with a properly insured credit union. The section also states, however, that "the administrator of the Alabama credit union administration shall be vested with authority ... to permit other acceptable insurance coverage of its accounts to be utilized by a credit union."

Title II of the Federal Credit Union Act provides for a credit union insurance program run by the National Credit Union Administration Board. The Board is required to insure federal credit unions and may insure state-chartered credit unions that satisfy various requirements set forth in Title II. 12 U.S.C.A. § 1781.

National Deposit Guaranty Corporation is an Ohio corporation that insures credit unions in a number of states. In November 1981, the administrator of the Alabama credit union administration wrote National to inquire whether the company might be interested in insuring credit unions chartered by the State of Alabama. However, after further correspondence between the two, the administrator informed National in December 1983 that the state banking department had decided to continue to require state-chartered credit unions to obtain federal insurance. He explained that the banking department interpreted § 5-17-19 to mean that state-chartered credit unions ordinarily must obtain federal insurance and that he could permit "other acceptable insurance" only in unusual circumstances. He further explained that there were no unusual circumstances indicating that alternative insurance should be permitted.

This lawsuit ensued. Using a shotgun approach, National has made the following claims that § 5-17-19 is unconstitutional, both on its face and as applied: (1) it is preempted by federal law; (2) it impermissibly restrains and burdens interstate commerce; (3) it violates "procedural" due process; (4) it violates "substantive" due process; and (5) it denies "equal protection." By these claims, National argues in general that the only limit on its authority to do business in Alabama is federal law.

### II.

The first question which this court must consider is whether the abstention doctrine first established in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), requires the court to refrain from exercising jurisdiction over this case. This doctrine mandates that federal courts should refrain from deciding certain cases involving questions of state law. Two factors must be present for *Pullman* abstention to apply: "(1) an unsettled question of state law and (2) that the question be dispositive of the case and would avoid, or substantially modify, the constitutional question." *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir.1983). Therefore, "an uncertain question of state

law is critical to the decision to abstain. The test of uncertainty is typically said to be that the state law must be *fairly subject* to an avoiding construction." *Id.* (emphasis in original).

The state officials sued argue that § 5–17–19 is uncertain because, on one hand, it appears to require Alabama credit unions to obtain federal insurance, while, on the other hand, giving the administrator of the Alabama Credit Union Administration the discretion to allow "other acceptable insurance coverage." The court fails to see the uncertainty. The Alabama legislature has defined federal credit union insurance as the norm, but has allowed the administrator under certain circumstances to use his discretion to allow other insurance.

The only issue which a state court might address is the scope of the administrator's discretion. However, no construction of the scope of the administrator's discretion will avoid the challenge made here that the statute is unconstitutional because it does not allow independent credit union insurers unbridled freedom to do business in Alabama. Given this challenge and the above standard for *Pullman* abstention, this court should not refrain from exercising jurisdiction.

### III.

■ The state officials further argue that, under the eleventh amendment to the U.S. Constitution, they are immune from this suit in federal court. Their argument is without merit. National seeks damages against the state officials in their "individual" capacities, but only injunctive relief against them in their various "official" capacities. The eleventh amendment does not bar such a suit. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Davis v. Alabama State University,* 613 F.Supp. 134, 139–40 (M.D.Ala.1985).

The state officials also claim that they are entitled in their individual capacities to "qualified immunity" from liability for any damages resulting from a violation of constitutional or statutory rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Davis v. Alabama State University, supra.* The court does not reach the merits of this defense because, as demonstrated later, National has failed to establish the violation of any statutory or constitutional right.

### IV.

■ The court now turns to National's claims. National's first claim is that § 5–17–19 is preempted by federal law, in particular Title II of the Federal Credit Union Act. Title II provides in part that,

(a)(1) An insured credit union other than a Federal credit union may, upon not less than ninety days' written notice to the Board and upon the affirmative vote of a majority of its members within one year prior to the giving of such notice, terminate its status as an insured credit union. (2) Any insured credit union, other than a Federal credit union, which has obtained a new certificate of insurance from a corporation authorized and duly licensed to insure member accounts may upon not less than ninety days' written notice to the Board convert from status as an insured credit union under this chapter.

12 U.S.C.A. § 1786(a)(1) & (2). National argues that § 1786 is the only limit on its authority to do business with any state-chartered credit unions in any state.

No federal statute will be found "preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). *See also Hillsborough County v. Automated Medical Labs, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). "The intent of Congress to pre-empt state law may be either express or implied. * * * Explicit pre-emptive language may

be found on the face of the statute itself, in its legislative history, or in regulations promulgated pursuant to the statute." *Howard v. Uniroyal, Inc.,* 719 F.2d 1552, 1556 (11th Cir.1983). Congress's implicit intent to supplant state law may be inferred if (1) the scheme of federal law is so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it, or (2) the federal statute touches a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject or (3) enforcement of state law presents a serious danger of conflict with the administration of federal law. *Id. citing Commonwealth of Pennsylvania v. Nelson,* 350 U.S. 497, 502–504, 76 S.Ct. 477, 480–82, 100 L.Ed. 640 (1956).

National argues first that while it is true that under the Federal Credit Union Act states retain general organizational and supervisory authority over state-chartered credit unions, *see* 12 U.S.C.A. §§ 1752(6), 1781(a), federal law expressly preempts the specific and narrow area of insurance. National points to § 1786(a)(2) and argues that this subsection provides the only requirements independent credit union insurers must meet to offer coverage to state-chartered credit unions. National overlooks some very important language in § 1786(a)(2), however. The subsection provides that only those independent insurers "authorized and duly licensed" to provide such insurance may provide coverage. It is clear from the subsection that the phrase means those insurers authorized and duly licensed by "the appropriate state." Therefore, under § 1786(a)(2), whether and to what extent independent insurers may offer and provide coverage in a state is left to the determination of that state. The Federal Credit Union Act not only does not preempt state regulation of independent credit union insurers, such as National, it expressly provides for such regulation.

The legislative history of the Act also evinces no explicit Congressional intent to exclude state regulation of insurance for state-chartered credit unions. In 1970, Congress amended the Act to provide insurance for federal credit unions. The 1970 amendment made the newly created federal insurance funds available to state credit unions as well. Congress deemed it necessary to offer insurance to state credit unions because, at the time of the amendment's passage, only Massachusetts, Rhode Island, and Wisconsin had some form of state credit union insurance. Extending federal insurance coverage to state-chartered credit unions was an effort to provide protection for citizens' accounts because the majority of states were not then equipped to provide such insurance. H.R. Rep. 91–1457, 91st Cong., 2nd Sess., reprinted in 1970 U.S.Code Cong. & Ad. News, 4166, 4167–68. There was no intent in the 1970 amendment to take away state authority over insurance for state-chartered credit unions. The House Report prepared by the House Banking and Currency Committee states that the legislation was "designed solely to give credit unions the same insurance afforded other federally chartered financial institutions and should be considered as a reward for the outstanding job performed by credit unions." *Id.* at 4167. The opportunity to receive federal insurance was extended to state credit unions as an aid to, not in lieu of, state regulatory power.

In 1974, the Federal Credit Union Act was further amended by adding subsection (a)(2) to § 1786. This new section provided an opt-out mechanism for state-chartered credit unions in states administering credit union insurance programs. The amendment was one of several amendments passed in an effort by Congress to minimize federal regulation of savings and loan associations and credit unions. House members were generally united in the view that federal control, particularly of federal credit unions, must be minimized "to increase operational efficiency and to equip credit unions and managers with the flexibility required to minimize the effect of disintermediation." 120 Cong. Rec. 20,228 (1974). The legislative history provides no evidence that Congress intended either expressly or by implication to preempt state

authority to regulate insurance for state-chartered credit unions.

Nor is there any evidence of implicit pre-emption. As already stated, the Federal Credit Union Act expressly recognizes that state-chartered credit unions that elect to participate in the insurance coverage program will still be subject to state laws; and, more importantly, it expressly provides that independent credit union insurers are also subject to state regulation. There is no conflict, direct or indirect, between § 1786 and § 5–18–19. The federal provision provides states who have previously used federal insurance the option of taking on the task of providing insurance, and, in conformity with this provision, Alabama has determined pursuant to § 5–17–19 that it does not yet desire a non-federal insurance program for state-chartered credit unions and has opted to maintain its preference for federal insurance.

## V.

■ National's next argument is that § 5–17–19 violates the commerce clause in the U.S. Constitution. The court disagrees. The Supreme Court has suggested that courts use the following two-tier approach in analyzing economic regulations under the commerce clause:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state interests, we have generally struck down the statute without further inquiry. * * * When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown–Forman Distillers v. N.Y. State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986) (citations omitted).

The Court has "also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the ... balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* In other words, the two-tiered approach described above is just that, an approach; it is not a substitute for that rigorous, in-depth analysis necessary to uncover the "ingenious" as well as the obvious violation.

The question which this court must resolve is whether Alabama places an unreasonable burden upon interstate and local commerce by enacting a statute that effectively bars all private credit union insurers from operating within the state. "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of America*, —— U.S. ——, ——, 107 S.Ct. 1637, 1648, 95 L.Ed.2d 67 (1987). Section 5–17–19 is not such a statute. It has the same effect on independent credit union insurers whether or not the insurer is a resident or nonresident of Alabama. Thus, it "visits its effects equally upon both interstate and local business." *Id.* at ——, 107 U.S. at 1649, *quoting Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980). National nevertheless contends that the section is discriminatory because it favors a federal insurer over private insurers. National has failed to show, however, how this discrimination significantly implicates and affects interstate commerce. Indeed, as demonstrated later, the intent and effect of the state's preference is limited to Alabama.

■ Statutes that adversely affect interstate commerce by subjecting activities to inconsistent regulations may also be invalid under the commerce clause. *CTS Corp., supra.* Section 5–17–19 is limited to activity within Alabama, and poses no such risk. The section "does not create an impermissible risk of inconsistent regulation by different States." *Id.*

Nevertheless, it cannot be overlooked that not all state statutes that purport to regulate evenhandedly matters of local concern will withstand constitutional chal-

lenge. A statute cannot be upheld if "the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits." *Edgar v. MITE Corp.*, 457 U.S. 624, 640, 102 S.Ct. 2629, 2639, 73 L.Ed. 2d 269 (1982) (emphasis added), *quoting Pike v. Bruce Church, Inc*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). "The Commerce Clause ... permits only *incidental* regulation of interstate commerce by the States; direct regulation is prohibited." *Edgar*, U.S. at 640, 102 S.Ct. at 2639 (emphasis in original).

Insurance and banking are now firmly acknowledged to be matters of profound local concern subject to state regulation. *See* Sections 1 & 2 of the McCarran–Ferguson Act, 15 U.S.C.A. §§ 1011, 1012 (insurance); *Western and Southern Life Insurance Co. v. State Board of Equalization*, 451 U.S. 648, 653, 101 S.Ct. 2070, 2075, 68 L.Ed.2d 514 (1981) (same); *Lewis v. BT Investment Managers, Inc., supra,* 447 U.S. at 38, 101 S.Ct. at 2016 (banking). Alabama's desire to protect its citizens from the devastation of losing accounts invested in institutions thought to be adequately insured is without question a legitimate, non-illusory legislative purpose. The statute was not passed with the intent of being, nor is it on its face, a protectionist measure, for both domestic and foreign private insurers are barred from providing credit union insurance; nor is there evidence that the statute as applied has the effect of discriminating against interstate markets. *See Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (Powell, J., plurality opinion) (if justifications for state law are not illusory, court should not second-guess legislative judgment about their importance).

National asserts that interstate commerce will nevertheless be clearly and unreasonably burdened because state credit unions will be allowed to transact business with only the National Credit Administration Board. The company has failed to demonstrate, however, how § 5–17–19—which as enacted and applied certainly burdens its ability to transact business in Alabama—is anything other than an incidental burden on the interstate market. First, the statute does not impede, directly or indirectly, National's ability to do business in other states. The reach of the statute is the state's borders. *Cf. Brown–Forman Distillers v. N.Y. State Liquor Authority,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (although state statute was local on it face, its effects were extraterritorial, in violation of commerce clause). Second, no state credit union has asserted that its ability to transact interstate business has been impeded by the statute. Any burden which Alabama's prohibition may have on interstate commerce is therefore not "clearly excessive" in relation to the putative local benefits. Section 5–17–19 is not invalid under the commerce clause.

### VI.

■ National argues next that its right to "procedural" due process under the fourteenth amendment to the U.S. Constitution was violated. The court again disagrees. National argues first that state officials deprived it of "property interest" without procedural due process. The fourteenth amendment provides "procedural" protection—that is, notice and a hearing—only for those property interests that amount to a specific and legitimate "claim of entitlement." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have such an entitlement, a plaintiff must have more than an abstract need or desire for a benefit, and more than a unilateral expectation of it; instead, the claim must be based on, and defined by, positive rules such as state law or mutually explicit understandings. *Id.*

National has pointed to no state law or regulation that creates a protectable property interest in providing insurance to state-chartered credit unions. At best, the relevant state law merely gives the administrator of the state credit union administration the discretion to permit credit unions to use alternative sources of insurance under certain circumstances; but a state statutory scheme that provides a discre-

tionary right does not necessarily give rise to a property interest. *See Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 10–12, 98 S.Ct. 1554, 1560–61, 56 L.Ed.2d 30 (1978); *Punikaia v. Clark,* 720 F.2d 564, 566 (9th Cir.1983), *cert. denied,* 469 U.S. 816, 105 S.Ct. 83, 83 L.Ed.2d 30 (1984).

■ Moreover, the correspondence between National and state officials created, at most, a "unilateral expectation" that the company would be allowed to transact business in Alabama. The company's expectation of a discretionary benefit is not by itself, as noted, a property interest subject to the protections of the due process clause; no mutually explicit understanding was reached here.

■ National argues next that state officials denied it a "liberty interest" without procedural due process. The company relies on a notion of law in the realm of economic regulation that has been outdated since the 1930's and the 1940's. As the Supreme Court explained not too long ago in *New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 106–07, 99 S.Ct. 403, 410, 58 L.Ed.2d 361 (1978),

"[T]he fact that a liberty cannot be inhibited without due process of law does not mean that it can under no circumstances be inhibited." *Zemel v. Rusk,* 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965). At least since the demise of the concept of "substantive due process" in the area of economic regulation, this Court has recognized that, "[l]egislative bodies have broad scope to experiment with economic problems...." *Ferguson v. Skrupa,* 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963). States may, through general ordinances, restrict the commercial use of property, *see Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and the geographical location of commercial enterprises, *see Williamson v. Lee Optical Co.,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). Moreover, "[c]ertain kinds of business may be prohibited; and the right to conduct a business, or to pursue a calling, may be conditioned.... [S]tatutes prescribing the terms upon which those conducting certain businesses may contract, or imposing terms if they do enter into agreements, are within the state's competency." *Nebbia v. New York,* 291 U.S. 502, 528, 54 S.Ct. 505, 512, 78 L.Ed. 940 (1934).

National has no liberty interest that precludes, absent notice and a hearing, state officials from preferring federal insurance.

## VII.

■ National also argues that the state officials' refusal to allow it to insure state-chartered credit unions violates its right to "substantive" due process. The company maintains, in substance, that it has a right to contract and conduct its business as it chooses without interference from the state. This claim is also meritless. The company again relies on an outdated notion of law in the area of economic regulation. *See New Motor Vehicle Board v. Orrin W. Fox Co., supra* (discussing of the demise of the concept of "substantive due process" in the area of economic regulation). "[L]egislation otherwise within the scope of acknowledged state power, not unreasonably or arbitrarily exercised, cannot be condemned because it curtails the power of the individual to contract." *Hardware Dealers' Mut. Fire Ins. Co. v. Glidden Co.,* 284 U.S. 151, 157–58, 52 S.Ct. 69, 71, 76 L.Ed. 214 (1931). Judicial determinations cannot supplant legislative findings of how best to protect the welfare of Alabama's citizens. This court must find that a statute is a reasonable exercise of the state's legislative power if the provisions bear some rational relationship to the purpose that the law seeks to achieve. *See New Motor Vehicle Board v. Orrin W. Fox Co., supra.* Section 5–17–19, as enacted and applied, satisfies this rational relationship standard. The provision is based on a belief that state-chartered credit union funds will be more secure if insured federally.

## VIII.

■ National's final argument is that the state officials' refusal to allow it to

insure state credit unions to the same extent they allow the National Credit Union Administration Board to do so, constitutes a denial of equal protection of the laws under the fourteenth amendment to the U.S. Constitution. National's argument is again meritless. Where a statute, as enacted and applied, does not affect a fundamental interest or make a distinction based upon a suspect classification, the statute "need only be tested under the lenient standard of rationality that ... has [been] traditionally applied in considering equal protection challenges to regulation of economic and commercial matters. * * * Under that standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Exxon Corp. v. Eagerton,* 462 U.S. 176, 195–196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983) (citations omitted). As already demonstrated, section 5–17–19 does not discriminate against nonresident competitors. *See Metropolitan Life Insurance Co., v. Ward,* 470 U.S. 869, 882, 105 S.Ct. 1676, 1684, 84 L.Ed.2d 751 (1976) ("promotion of domestic business by discriminating against nonresident competitors is not a legitimate purpose" under the equal protection clause). Nor does it otherwise affect a fundamental interest or involve a suspect classification. The statute instead serves the legitimate state purpose of a preference for federal insurance.

### IX.

In conclusion, the court holds that National has failed to establish the violation of any right under federal law. An appropriate judgment will be entered.

### JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the motion for summary judgment filed by plaintiff National Deposit Guaranty Corporation is denied;

(2) That the motion for summary judgment filed by defendants Charles W. Sauls, Jr., Kenneth McCartha, Gene Mauldin, Rex Pinkard, Robert H. McSwain, Charles C. Therrell, Roger Hester, J.R. Barnard, and James D. Stephens, is granted; and

(3) That judgment is entered in favor of all defendants and against the plaintiff.

It is further ORDERED that costs are taxed against the plaintiff, for which execution may issue.