**Loveday OVERTON, Plaintiff,**

v.

**JOHN KNOX RETIREMENT TOWER, INC., Defendant.**

**Civ. A. No. 88–T–781–N.**

United States District Court, M.D. Alabama, N.D.

Aug. 10, 1989.

J. Bernard Brannan, Jr., Patricia K. Kelley, Brannan & Guy, Montgomery, Ala., for plaintiff.

Janice Boyd Neal, Davis & Neal, Montgomery, Ala., amicus curiae.

Robert C. Black, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

Plaintiff Loveday Overton, who is 88 years old, charges in this lawsuit that she was denied due process of law under the fifth amendment to the Constitution of the United States when defendant John Knox Retirement Tower, Inc., denied her admission to its facility. The court's jurisdiction has been properly invoked pursuant to 28 U.S.C.A. § 1331. Based on the evidence presented at a nonjury trial of this cause, the court finds that Overton's claim lacks merit.

### I.

Overton currently resides in a nursing home in Montgomery, Alabama. In July 1987, she applied for admission to John Knox Retirement Tower, Inc., a corporation managing an apartment complex in Mont-

gomery accommodating the elderly.[1] The Retirement Tower is not a health care facility, but rather is a low-rent apartment complex designed for residents 62 years of age or older of limited income. John Knox Retirement Tower was constructed through a low-interest loan from the federal Department of Housing and Urban Development (HUD), pursuant to § 202 of the Housing Act of 1959, 12 U.S.C.A. § 1701q.

Overton submitted an application provided by the Retirement Tower along with three letters of recommendation. At some point, Overton submitted statements from attending physicians to the effect that she was capable of independent living outside a nursing home environment. One of these statements noted, however, that Overton's "situation is certainly subject to change, particularly considering [her] age...." Two of the letters discussed the fact that Overton had attempted suicide several years earlier, although neither doctor believed she had any psychological disorder at the time the letters were composed.

The administrator of John Knox Retirement Tower, Elizabeth Mozley, reviewed Overton's application. Mozley was acquainted with Overton's brother, Thomas R. Overton, and contacted him regarding his sister's application. Thomas Overton was vehemently opposed to this application; he felt strongly that Loveday was not capable of living in an environment like John Knox Retirement Tower, where she would not receive nursing care. Thomas Overton conveyed this opposition to Mozley, and later he sent a letter to John Knox Retirement Tower restating the grounds for his opposition.

Mozley neither approved nor rejected Overton's application, but instead referred it to John Knox Retirement Tower's õversight committee. The committee conducted an informal hearing on Overton's application. At the hearing, Overton appeared with her advisor who had assisted her in filling out the form, and with several supporting witnesses. Thomas Overton did

not appear at this hearing, although the committee apparently had access to his letter in opposition to the application. After hearing all the evidence Overton wished to provide, the committee rejected her application, on the basis that it would not be in Overton's best interest to live in the less restrictive environment of John Knox Retirement Tower.

## II.

Overton contends that this decision by John Knox Retirement Tower violates her rights under the Due Process Clause of the fifth amendment. She claims that the Retirement Tower denied her admission to its facility on the basis of her relatives' objections to her desired residency there, rather than on objective medical evidence. As relief for this violation, Overton seeks a permanent injunction forcing the Retirement Tower to admit her.

Overton claims relief under a theory of substantive due process. In order to prevail, Overton must establish the three elements of her claim: (1) that she has a constitutionally protected liberty or property interest; (2) that government action deprived her of that interest; and (3) that the governmental action was "pretextual, arbitrary and capricious, and ... without any rational basis." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir.1989); *Anthony v. Franklin County*, 799 F.2d 681, 684 (11th Cir.1986); *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982). The court finds that Overton has not established any of these three elements.

### A. PROPERTY INTEREST

■ The controlling principles relating to Overton's claim of a constitutionally protected interest were set out in *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). In the realm of government benefits, the key issue is whether a claimant can assert a "legitimate claim of entitlement" to those benefits. *Id.* To have such an entitlement,

---

1. Overton had applied to live at John Knox at some point prior to submitting the application forming the basis of this litigation. Although

the defendant accepted Overton's first application, she decided not to move into the complex at that time.

a plaintiff must have more than an abstract need or desire for a benefit, and more than a unilateral expectation of it; instead, the claim must be based on, and defined by, some expression of positive law or a mutual agreement. *Id.; National Deposit Guaranty Corp. v. Sauls*, 684 F.Supp. 262, 268 (M.D.Ala.1987). *See generally* J. Nowak, R. Rotunda & J. Young, Constitutional Law 476–78 (3d ed. 1986).

■ Overton bases her claim of entitlement on § 202 of the Housing Act of 1959, 12 U.S.C.A. § 1701q, and a related federal regulation, 24 C.F.R. § 277.8. In § 202, Congress fashioned one of a series of programs designed to stimulate construction of privately managed housing for elderly, handicapped, and low income individuals. *See generally City of Boston v. Harris*, 619 F.2d 87, 89–91 (1st Cir.1980) (per curiam) (reviewing this and other federal housing programs). Congress authorized HUD to make long-term, low-interest rate loans under this program to private sponsors who are otherwise unable to arrange funding "from other sources upon terms and conditions equally as favorable" as those offered by HUD, § 1701q(a)(2)(A), (a)(3). In addition to the provision of federal credit to finance such projects, sponsors may also seek federal rent subsidy benefits on behalf of tenants at § 202 projects, under § 8 of the Housing Act of 1937, § 1701q(g). *See Brecker v. Queens B'Nai B'Rith Housing Development Fund Co., Inc.*, 607 F.Supp. 428, 431 (E.D.N.Y.1985), *aff'd*, 798 F.2d 52 (2d Cir.1986).

Accompanying the federal aid to private sponsors are limitations on their operations designed to advance the purposes of the Housing Act. After defining an "elderly" individual for purposes of the program as one who is 62 years of age or over, the statute reads: "The Secretary shall prescribe such regulations as may be necessary to prevent abuses in determining ... the eligibility of families and persons for admission to and occupancy of housing constructed with assistance under this section." § 1701q(d)(4). The Secretary promulgated the following regulation pursuant to this section.

Prior to loan disbursement, an applicant [for a § 202 loan] is required to enter into a regulatory agreement with the Secretary under which the applicant shall agree: (a) To establish rentals approved by the Secretary, (b) *to limit occupancy of the project to elderly or handicapped families in accordance with occupancy criteria approved by the Secretary*, including prescribed income limits, (c) not to rent any portion of the project for transient or hotel use, and (d) to provide a governing board and management acceptable to the Secretary.

24 C.F.R. § 277.8 (emphasis added). Overton argues essentially that she is entitled to residency at John Knox Retirement Tower because she meets the criteria which the Retirement Tower has itself established for tenant selection and which the Secretary has approved. John Knox Retirement Tower defines those criteria in two paragraphs of its application form.

Applicants must be 62 years of age or over or the spouse of a resident who is 62 years of age or over. A single person may receive up to $19,250 annually. This includes social security, retirement pensions, all annuities, interest and rental income.

Each applicant is asked to furnish three character references and a statement from his or her doctor on [her] current state of health. It is the responsibility of the applicant to make sure that the character references are mailed to this office in order that the application may be handled as rapidly as possible. Please do not use relatives as character references.... Admission is by committee action and requires a personal interview. All residents are required to have a local sponsor and local doctor during tennancy [sic] at [John Knox Retirement Tower].

This court's research has not uncovered any cases rigorously considering the question of whether applicants for housing constructed under the § 202 program enjoy a legitimate entitlement to such housing rising to the level of a constitutionally protected property interest under the *Roth* test. The district court in *Knutzen v. Nel-*

*son,* 617 F.Supp. 977, 984 (D.Colo.1985), *aff'd on other grounds sub nom. Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343 (10th Cir.1987), found that the plaintiff-applicants had no constitutionally protected property interest in housing at a complex constructed under the § 202 program, but that decision depended on the fact that plaintiffs concededly did not meet the selection criteria adopted by the facility. Similarly, in assessing the likelihood of success prong of plaintiff-applicants' claim for a preliminary injunction in a § 202 case, the district court in *Edge v. Pierce,* 540 F.Supp. 1300, 1305 (D.N.J.1982), stated, "If plaintiffs are not properly qualified for this Section 202 housing, they most likely have no property interest." Both *Knutzen* and *Edge,* however, involved plaintiffs who admittedly did not meet the criteria set by the housing facilities and who sought forcibly to broaden those criteria to include persons in the same class as plaintiffs. Overton's claim is different. She asserts that she meets the criteria established by John Knox, and that John Knox simply departed from those criteria in assessing her application. Neither *Knutzen* nor *Edge* appears on point with such an argument.

Research into analogous provisions of federal housing law reveals a sharp disagreement among the various courts reaching the constitutionally protected interest question. The issue has arisen in numerous cases involving federally subsidized housing under § 8 of the United States Housing Act, 42 U.S.C.A. § 1437f.

One camp holds that applicants for § 8 housing have a protected property interest. Courts adopting this position find a legitimate entitlement to such housing on the basis of the extensive government regulation of these projects, and on the fact that Congress explicitly passed this legislation in order to aid lower-income families and individuals in finding a decent place to live. *See Ressler v. Pierce,* 692 F.2d 1212, 1215–16 (9th Cir.1982); *see also Davis v. Mansfield Metropolitan Housing Authority,* 751 F.2d 180, 184 (6th Cir.1984) (citing cases). The Ninth Circuit in *Ressler* distinguished the claim held not to be a constitutionally protected interest in *Roth* on the fact that in that case "the entity charged with dispensing governmental benefits had 'unbridled discretion' in the selection process." 692 F.2d at 1215.

It is clear, however, that the [facility managers] had only limited discretion in the Section 8 application and selection process. While under the Section 8 program "the selection of tenants ... shall be the function of the owner," 42 U.S. C.A. § 1437(d)(1)(A), the regulations and guidelines promulgated pursuant to the statute closely circumscribe an owner's discretion. For example, the regulations dictate what percentage of the Section 8 contract units an owner must rent to "very low-income families" (24 C.F.R. § 886.117(b)) and require the owner to select eligible tenants in accordance with a HUD-approved marketing plan. (*id.* § 886.121(a)). In addition, HUD's administrative guidelines set eligibility standards for Section 8 applicants, provide detailed application and instruction forms, establish rules for the calculation of an applicant's income and allowances, and require HUD review of all certificates of eligibility after determinations have been made by project owners. *See* HUD Handbook 4352.1, "Loan Management Section 8 Set–Aside," paras. 23–26.

*Id.*

Other courts have expressed a different view of the discretion enjoyed by project managers under § 8 programs. After a close analysis of statutory and regulatory language, the Seventh Circuit expressly rejected both the legal analysis and the conclusion of the *Ressler* court. *Eidson v. Pierce,* 745 F.2d 453 (7th Cir.1984). The Seventh Circuit's reading of § 8 law convinced it that *no criteria defined by law limited an owner's discretion to accept or reject applicants for housing.* Absent well-defined, fact-specific criteria, the *Eidson* court held that the traditional due process requirement of a hearing would be meaningless.

In [*Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)] and numerous other public benefit cases, the law established eligibility criteria, and

any person who satisfied those factual criteria was entitled to the benefits. A hearing would thus be an effective remedy for the individual because it would provide a reliable means for resolving disputed facts entitling the person to benefits. Section 8 is not, however, a simple entitlement program. The eligible recipient must be accepted by a private landlord in order to receive benefits. Factual findings at a hearing could therefore not entitle these plaintiffs to Section 8 benefits.

745 F.2d at 461. *See also Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483, 495 (9th Cir. 1974) (Hufstedler, J., dissenting).

Although the Seventh Circuit in *Eidson* did not comment on the other basis for the Ninth Circuit's holding in *Ressler,* that plaintiff was a member of the class targeted for special benefit by Congress, the Eighth Circuit recently severely discounted the weight of this factor in its analysis of the issue. Conceding that the specially benefitted class factor "is a starting point for due process analysis," the court of appeals in *Hill v. Group Three Housing Development Corp.,* 799 F.2d 385, 391 (8th Cir.1986), went on to opine that "it is far from dispositive of the question whether an individual has a legitimate claim of entitlement to Section 8 benefits." The *Hill* court then followed the Seventh Circuit's analysis and conclusion that insufficient legal limitations existed on the discretion of project managers to accept or reject applications to solidify an applicant's "expectation" into an "entitlement." The Eighth Circuit agreed with the *Eidson* court that a hearing would be a meaningless remedy for an applicant for § 8 housing benefits. "Even if Section 8 applicants rejected by an owner were to receive a hearing, there still is nothing that legally would *require* the owner to accept the applicant.... In short, while the selection of tenants is not left to the private owner's unfettered discretion, absent invidious discrimination the actual selection of individual tenants from among the class of otherwise eligible applicants is left exclusively to the owner's business judgment and discretion." *Id.* at 393.

Although their outcomes on the issue differed, both the *Eidson* and the *Ressler* courts agreed that a decisive factor in the question of whether applicants for federally financed housing have a constitutionally protected property right is the presence or absence of specific constraints on the discretion enjoyed by managers in evaluating applications for housing. This court has itself recently noted that a "statutory scheme that provides a discretionary right does not necessarily give rise to a property interest." *Sauls,* 684 F.Supp. at 269.

One of the difficulties the court has in this case is that Overton has not pointed to any limiting aspects in John Knox Retirement Tower's criteria, other than the age and income limits, that give any sort of structure to the company's decision whether to accept an applicant. Overton's argument, however, does not appear to be that once an applicant establishes compliance with the age and income requirements, she is automatically entitled to entry into John Knox Retirement Tower. Rather, she contends, and the Retirement Tower concedes, that the standard used by the Retirement Tower to accept applicants for admission is whether the applicant is "capable of independent living." This standard was submitted to, and approved by, HUD in its decision to allow the Retirement Tower to participate in the § 202 program. John Knox Retirement Tower states to the court that this standard means, in practical terms, whether the applicant is capable of taking care of her own feeding and medication needs.

Although this standard could arguably provide the "substantive limitations on an owner's discretion" necessary to give rise to a claim of entitlement under some other regulatory system, it does not do so under § 202. Section 277.8 merely limits a participating facility to accepting applicants meeting certain criteria approved by the Secretary; the regulation does not require that facility managers accept all applicants who meet the criteria. The regulation only bars participating facilities from considering certain applicants. It sets no strictures on how the facility must choose tenants

from within the pool of eligible applicants. Facility managers still have broad discretion after determining that the applicant meets the standard approved by HUD. A person who meets the "capable of independent living" standard has no assurance of being accepted to John Knox Retirement Tower, and thus has no legitimate expectation of entitlement to admission to the complex. Or, to put it another way, a hearing would be useless because, in light of its broad discretion to reject applicants, the facility is not required as a matter of law to accept any particular applicant.

In sum, given the nature of the regulations relating to § 202 housing, the court feels that John Knox Retirement Tower in this case bears discretion in its selection of tenants at least as broad as that enjoyed by the owners in the § 8 cases. The court holds that this discretion defeats Overton's argument that she has a constitutionally protected property interest arising under federal housing law.

### B. GOVERNMENTAL ACTION

■ Although the court finds that Overton has not established the existence of a constitutionally protected interest, it nonetheless addresses the other elements of her claim for the sake of completeness. The next element is the governmental action nexus. A bulwark of constitutional due process jurisprudence is the "dichotomy between state action, which is subject to scrutiny under the ... Due Process Clause, and private conduct, against which the [Clause] affords no shield, no matter how unfair that conduct may be." *National Collegiate Athletic Association v. Tarkanian,* — U.S. ——, 109 S.Ct. 454, 461, 102 L.Ed.2d 469 (1988). This dichotomy has developed largely in cases arising under the fourteenth amendment, applicable to the states. In the instant case, the apposite question is whether there exists a "sufficient nexus to transform [John Knox Retirement Tower's] act into that of the federal government." *Roberts v. Cameron–Brown Co.,* 556 F.2d 356, 358 (5th Cir. 1977). For analytical purposes, the fact that the alleged governmental action hinges on a federal, rather than state, nexus

has no significance. *See, e.g., id.; Nail v. Community Action Agency of Calhoun County,* 805 F.2d 1500 (11th Cir.1986) (per curiam).

The only federal nexus demonstrated by Overton is John Knox Retirement Tower's receipt of a loan from HUD under § 1701q. John Knox Retirement Tower admits receipt of such a loan, and denies further federal involvement in its operations.

Much as in the last section, the court has located no cases directly considering the issue of the governmental or nongovernmental character of decisions made by housing corporations receiving § 202 loans. Thus, general principles relating to government action must control this case. The Eleventh Circuit has recently observed:

A private party may be so closely connected to the state that its activities may be attributed to the state. However, extensive regulation by the state is not enough to establish state action. The complaining party must show "a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1981) (quoting *Jackson v. Metropolitan Edison,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). Normally, a state can be held responsible for a private decision only when it has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the state." *Blum,* [457 U.S. at 1004, 102 S.Ct. at 2786].

*Nail,* 805 F.2d at 1501. When, as is the case here, a court is faced with a private actor who receives substantial financial assistance from the federal government coupled with accompanying federal regulation of the actor's activity, the critical question appears to be the level of control exerted by those regulations over the specific activity challenged. For example, in *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), a vocational counselor challenged the decision of the

director of a school terminating her employment. The school at issue received state funds accompanied by detailed regulations on a variety of matters. On the subject of personnel matters, however, the state regulations imposed few limitations on the authority of the school administrators. As the Supreme Court noted:

> Here the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed little interest in the school's personnel matters. The most intrusive personnel regulation promulgated by the various government agencies was the requirement that the Committee on Criminal Justice had the power to approve persons hired as vocational counselors. Such a regulation is not sufficient to make a decision to discharge, made by private management, state action.

457 U.S. at 841–42, 102 S.Ct. at 2771–72.

To similar effect is *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), decided the same day as *Rendell–Baker.* In *Blum,* patients in a state-regulated nursing home were transferred by decision of nursing home physicians to a lower-level care facility. The Supreme Court noted that state regulations required nursing home personnel to complete "patient care assessment forms designed by the State" and to send those forms to the transferee facility. However, as the Court further noted,

> These regulations do not require the nursing homes to rely on the forms in making discharge or transfer decisions, nor do they demonstrate that the State is responsible for the decision to discharge or transfer particular patients. Those decisions ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State.

457 U.S. at 1008, 102 S.Ct. at 2788.

Finally, the Eleventh Circuit in *Nail* applied *Rendell–Baker* to a similar factual situation involving a teacher's aide fired by a private non-profit corporation engaged in the federal Headstart Program and receiving large amounts of state and federal funds. The Eleventh Circuit focused on regulation specifically addressed to personnel decisions and found such regulation too sparse to provide the sufficient nexus with government to support a § 1983 claim. The court commented that federal regulations required the contracting corporations involved with Headstart to establish personnel policies, but that such policies were not subject to federal approval. In short, the court found that "none of the specific personnel decisions are controlled by state or federal regulations." *Nail,* 805 F.2d at 1501.

Corporations participating in the HUD loan program submit to federal regulation of their activities to a limited degree. For instance, the Secretary requires the corporation to submit to the terms of Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000d et seq. (antidiscrimination law applying to federally funded programs), and Title VIII of the Civil Rights Act of 1968, 42 U.S.C.A. §§ 3601–3619 (antidiscrimination housing law). However, the degree of federal control over the specific activity challenged by Overton—admission of tenants to the housing facility—is not great. As the court discussed at some length in the previous section, HUD does require corporations participating in the § 202 program to submit admission criteria for approval. Beyond confirming that the participant meets the specific purposes of statute in terms of income and age requirements and nondiscrimination recognition, however, HUD does not exert control over participant decisions on specific admission applications. Although HUD limits occupancy in § 202 housing to those applicants who meet criteria approved by the Secretary, HUD does not require that housing managers accept all those who meet the criteria. Moreover, in line with this broad discretion retained by housing managers, applicants like Overton have no means of appeal of the housing corporation's decision to HUD or to any other federal agency. The court therefore finds no "sufficiently close nexus between [HUD] and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [federal government] itself." *Nail,* 805

942

F.2d at 1501 (*quoting Blum*, 457 U.S. at 1004, 102 S.Ct. at 2786). Overton has not established the governmental action element of her due process claim.

## C. PRETEXT, ARBITRARINESS, AND CAPRICE

■ Finally, the court turns to the element of Overton's claim that John Knox Retirement Tower must have deprived her of her interest "by means that [are] pretextual, arbitrary and capricious." *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (*quoting Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir.1982)). The court finds that the Retirement Tower's refusal to admit Overton is not pretextual, arbitrary or capricious. First of all, Overton has not shown that in her place John Knox Retirement Tower has admitted someone who was incapable of independence. The record contains no evidence that the Retirement Tower violated the regulation limiting its occupants to those who meet HUD-approved criteria.

Second, the court cannot say that the committee's reliance on the views of Overton's brother, her closest relative, was unjustified. While Thomas Overton is neither a medical doctor nor a psychologist, certainly his personal knowledge of his sister's ability to live alone is worthy of credence. Moreover, the committee could have reasonably inferred from the statements of Overton's doctors both that Overton had been incapable of independent living in the past, and that she could become so again with little notice. John Knox Retirement Tower does not claim the ability to accommodate the medical and dietary needs of tenants who fall below this standard. Simply stated, the court does not find the Retirement Tower's action to be arbitrary or capricious as those terms are used in substantive due process doctrine.

The court is not insensitive to Loveday Overton's desire to live out the remainder of her life in a less confining environment than she now finds herself. Nor does the court believe that the law would permit the preferences of a person's relatives, considered in the abstract without reference to the reasons actually underlying those preferences, to frustrate that person's legitimate entitlement to government benefits. In this case, however, Overton has not shown any violation of due process norms by John Knox Retirement Towers. She has not demonstrated a constitutionally protected interest, nor has she shown that John Knox Retirement Tower used an unfair or inadequate means of determining her application for admission to it facility.

An appropriate judgment will be entered.

## JUDGMENT

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court that judgment be entered in favor of defendant John Knox Retirement Tower, Inc., and against plaintiff Loveday Overton; and that plaintiff Overton take nothing by her complaint.

It is the further ORDER of the court that costs be and they are hereby taxed against plaintiff Overton, for which execution may issue.